(No. 69958.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES TENNER, Appellant.

*Opinion filed October 21, 1993.—Rehearing denied January 31, 1994.*

HARRISON, McMORROW and NICKELS, JJ., took no part.

Rita A. Fry, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Maureen Harton and Kathleen Bom, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, James Tenner, was convicted of two counts of first degree murder, one count of attempted first degree murder, four counts of aggravated unlawful restraint, and one count of armed violence. At a separate sentencing hearing, the same jury found the defendant eligible for the death penalty and further found that there were no mitigating circumstances sufficient to preclude its imposition. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).) The defendant was accordingly sentenced to death. The defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we vacate the defendant's conviction for attempted murder and affirm the remaining convictions and the sentence of death.

On September 2, 1987, defendant, James Tenner, killed two persons and severely wounded a third by shooting them at point-blank range with a shotgun. The defendant had known two of the victims—Albert Sauls and Sauls' wife, Donna—since the early 1970s, and, at various times, had worked with Albert in a number of different businesses. At the time of the offenses charged here, Albert and the defendant each operated his own trucking firm; their garages were located in the same building in South Chicago Heights. Alvin Smith, the third victim, was employed by Albert.

On September 2, 1987, Albert Sauls and Smith returned to their garage after work. At about 6 p.m., Smith and Sauls were working on one of Sauls' trucks. Sauls' wife, Donna, and the defendant's former girlfriend, Shirley Garza, then arrived. When Smith attempted to leave the garage, he was met outside by the defendant, who was carrying a loaded shotgun. The defendant ordered Smith back into the garage.

Testifying on behalf of the State, Albert Sauls said that once inside the garage, the defendant, brandishing a shotgun, ordered him, his wife, Garza, and Smith to lie on the floor. The defendant then handed ropes to Shirley Garza and Donna Sauls and ordered the two women to tie the hands and ankles of Alvin Smith and Albert Sauls. The defendant then gave Garza more rope and ordered her to tie Donna Sauls in the same manner.

Sauls stated that the defendant, still holding the shotgun, ordered everyone to move to the defendant's garage, which was located within the same building. The victims then hobbled to the defendant's portion of the building. On one side of the defendant's garage three ropes of different lengths were strung across overhead beams; one end of each rope formed a noose, and the other end was tied to the wall. The defendant ordered Albert and Donna Sauls and Alvin Smith to stand under

the noose that corresponded to their height. At the defendant's direction, Garza then placed the nooses around the three other victims' necks. The defendant removed some rope from his pocket and, after tying a fourth noose, threw the rope over the beam and placed that noose around Garza's neck. The defendant then bound Garza's hands and feet.

Sauls testified that the defendant next placed duct tape over the victims' mouths. During part of that time, the defendant harangued the victims, complaining that the Saulses and Smith had "meddled" in the defendant's business by associating themselves with Garza. The defendant then stated that he was going to kill them all. At some point, the defendant removed the duct tape from their mouths so that they could respond to his charges.

Sauls testified that the defendant later removed the noose from around Shirley Garza's neck and pulled Garza into the office. When the defendant and Garza emerged from the office, Garza was crying. The defendant shoved Garza toward his station wagon, which was parked by the door. The defendant then shot Donna Sauls in the face, killing her, and shot and killed Alvin Smith. Finally, the defendant shot Albert Sauls twice. Albert, however, had been able to free his hands, and he was attempting to remove the noose from his neck as the defendant fired. Albert's arms were near his face and thus absorbed much of the blast when the gun discharged. The defendant then left the garage.

Afterwards, Albert untied the other end of the rope from the wall and crawled to a nearby house, where he summoned help. Several members of the South Chicago Heights police department responded to the call. Albert told the officers what had happened and stated that the defendant was responsible for the shootings. Descriptions of the defendant, Garza, and the defendant's car

were then broadcast to other law enforcement units in the vicinity. Albert estimated that the victims remained in the nooses for a period of 2 to 2½ hours.

Shirley Garza also testified on behalf of the State. She explained that the defendant was her former boyfriend and that they were no longer seeing each other at the time of the offenses charged here. Garza denied telling the defendant that she had been held captive by the Saulses in July 1987, as the defendant asserted. Garza further stated, however, that the defendant was upset when he learned that she had stayed with the Saulses after her breakup with the defendant. In her testimony, Garza corroborated Albert Sauls' description of the defendant's commission of the offenses. Garza further stated that, after all the victims were bound hand and foot, the defendant accused the Saulses of causing the termination of his relationship with Garza. Sometime later, the defendant removed Garza's noose, tape, and hand restraints; her feet remained bound. At the defendant's direction, Garza then went into the garage office to look for a handgun belonging to the defendant. When Garza was unable to find the weapon, the defendant ordered her to wait outside. Garza later heard five or six shots being fired. She testified that about 2½ hours had elapsed between the time the defendant had first entered the garage and when she heard the shots.

According to Garza, the defendant then opened the overhead door to the garage, drove his station wagon out of the building, and made her get into the vehicle after tying her hands behind her back. When she asked the defendant what had happened, he replied, " 'I did what I told you I was going to do and you're next.' " At this time, the defendant loaded his shotgun and placed it in the front seat of the vehicle. With Garza still in the car, the defendant met his wife at O'Hare Airport and

then began to drive toward Rockford, where he said he was going to kill Garza.

State police officers stopped the defendant's car on the Northwest Tollway around midnight, and all three occupants were taken into custody. The officers discovered a loaded shotgun in the driver's area and two boxes of shotgun shells and two pieces of rope elsewhere in the vehicle.

Forensic testing revealed that shotgun shells discovered at the crime scene had been fired from the shotgun found in the defendant's car. In addition, the wadding and pellets recovered from the bodies of Donna Sauls and Alvin Smith were consistent with those found in the shells contained in the defendant's gun. The presence of wadding in the victims' wounds was consistent with the victims' having been shot at close range. Autopsies performed on Donna Sauls and Alvin Smith confirmed that they died as a result of gunshot wounds.

The defendant testified in his own behalf at trial. He said that he had met Shirley Garza early in 1987 at a local doughnut shop. As their friendship developed, Garza and the defendant began a romantic relationship. On April 1, 1987, the defendant and Garza moved into an apartment together. The defendant stated that during the July 4, 1987, weekend Garza left for one week without telling him where she was going. According to the defendant, when she returned she told him that she had been held against her will at the Saulses' apartment, where she had been forced to participate in sexual activities. Afterwards, Garza remained with the defendant for about two or three more weeks before moving out. The defendant testified that he then began to experience problems in his relationship with the Saulses, as well as in his business. In mid-August, the defendant decided to close his business and return to his home in Rockford.

The defendant testified that on September 2, 1987, he left his garage in South Chicago Heights to go to the doughnut shop where he had first met Garza. After purchasing coffee, he saw the Saulses' car as he was driving back to the garage. Although the defendant could not identify the driver, he thought that he saw Garza struggling with another occupant of the car. When the defendant returned to the garage, he saw the Saulses' car parked outside. The defendant believed that the Saulses had again abducted Garza and he therefore decided to rescue her. The defendant explained that he prepared the rope restraints that were used on the victims because he knew that Albert Sauls had guns.

Armed with a shotgun and carrying the ropes in his pockets, the defendant then walked toward the portion of the building where Sauls' garage was located. The defendant encountered Alvin Smith outside the garage. According to the defendant, Smith was then target shooting with a .22-caliber pistol. When the defendant inquired about Garza, Smith invited him inside. The defendant also asserted that before entering Albert Sauls' garage, he heard shots being fired from the premises. In addition, the defendant testified that in the middle of August, as well as a few days prior to the offenses charged here, he had overheard the Saulses plotting to kill him. This fear, the defendant stated, was reawakened after he removed the tape from the victims' mouths and an argument began. During the exchange, the defendant stated that the victims threatened him and his family. The remaining portions of the defendant's testimony relating the commission of the offenses corresponded in large part to the testimony provided by Albert Sauls and Shirley Garza.

On cross-examination, the defendant said that he was not upset that Garza had allegedly been held captive by the Saulses in July, and he acknowledged that he never

confronted the Saulses about the matter or reported it to the police.

The defendant's former wife, Triva Tenner, also testified in the defendant's behalf at trial. Triva stated that she had divorced the defendant in 1987 following his arrest in the present case. Triva stated that around 7:45 p.m. on September 2, 1987, the defendant called her at their Rockford home and asked her to meet him at O'Hare Airport. Triva testified that she met the defendant there at about 11 o'clock that evening. Shirley Garza was also in the car at that time. Triva said that there were no signs that Garza was being held against her will.

At the close of evidence, the jury found the defendant guilty of the first degree murders of Donna Sauls and Alvin Smith, of the attempted first degree murder of Albert Sauls, of the aggravated unlawful restraint of Shirley Garza, Alvin Smith, Donna Sauls, and Albert Sauls, and of armed violence with respect to Albert Sauls. The matter then proceeded to a capital sentencing hearing before the same jury. At the first stage of the hearing, the State presented evidence that the defendant was born in August 1944 and hence was over the age of 18 at the time of the offenses charged here. Certified copies of the verdict forms reflecting the defendant's two convictions for first degree murder in this case were also received into evidence. The jury found the defendant eligible for the death penalty on the basis of the multiple-murder aggravating circumstance. Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3).

At the second stage of the sentencing hearing, the prosecution presented evidence of the defendant's prior offenses. Officer Robert Billington of the Rockford police department testified that on June 2, 1985, he responded to a domestic violence report made by Rita Darr, who identified herself as the defendant's girlfriend. Darr told

the officer that she and the defendant were arguing and that she was afraid the defendant was going to batter her. She also told the officer that the defendant had abused her during a four-year period. Although the defendant was not charged with an offense, an order of protection against the defendant was subsequently issued.

Detective Sergeant Steve Pirages of the Rockford police department testified that he interviewed Rita Darr on January 8, 1990, prior to trial in the present case. Darr indicated that she had met the defendant in 1982, that they lived together periodically and that they had two children together. She stated that the defendant had a bad temper, was very jealous, and had beaten her several times. Darr indicated that she visited the defendant in jail on a regular basis after his arrest.

Captain Dennis Boyd of the South Chicago Heights police department testified that on August 17, 1987, Shirley Garza reported that the defendant had entered her car the previous evening while she was stopped at an intersection. According to Garza, the defendant cut her on the arm and abdomen with a knife and held her at knife point for more than eight hours. According to Captain Boyd, Garza later decided not to file a complaint against the defendant.

Officer Thomas Peterson of the Chicago police department testified that on March 26, 1975, he stopped the defendant for a traffic violation. During a patdown search of the defendant, Officer Peterson discovered a fully loaded .357 revolver in the defendant's waistband. Criminal charges against the defendant were later dismissed.

Finally, the State entered into evidence a certified statement of the defendant's conviction for burglary on December 3, 1968. The defendant had pleaded guilty to

the offense, and he was sentenced to two years' probation.

In mitigation, the defense presented 12 witnesses, including six family members. All the witnesses testified that the defendant was a hard worker and had always been very helpful to others. They described how the defendant had grown up in poverty and had eventually become a self-made man who owned his own business. A correctional officer from the Cook County department of corrections testified that the defendant was a good inmate and often assisted the officer in her duties.

At the conclusion of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial judge accordingly sentenced the defendant to death for the two murder convictions. At a later hearing, the judge sentenced the defendant to various terms of imprisonment for the noncapital convictions.

I

In the present appeal, the defendant raises a number of challenges to his convictions and death sentence. We shall consider the defendant's allegations of error in the sequence in which the matters occurred in the proceedings below.

The defendant first argues that two prospective jurors were improperly excused for cause because of their views toward the death penalty. The defendant maintains that the views of the excluded venirepersons would not have substantially impaired their performance as jurors and that their removal for cause was therefore unwarranted.

The relevant portion of the trial judge's questioning of the first of the two prospective jurors at issue, Virginia Babbs, proceeded as follows:

"Q. Do you have any scruples, by which I mean strong feelings, either by reason of conscience or religion, against the death penalty?

A. I have a problem with the death penalty.

Q. Do you have scruples against the death penalty no matter what the facts may be?

A. No, I don't think so.

Q. Would your scruples substantially impair your ability to determine guilt or innocence in accordance with the evidence and the law?

A. No.

Q. *** Now, Virginia, if the defendant is found guilty of first degree murder, could you consider all of the possible penalties available under state law, including the death penalty?

A. No, not with the death penalty, no.

Q. Would you automatically vote against the death penalty no matter what the facts might reveal?

A. I couldn't say automatically I would do that regardless of what the facts might be. I'm sort of between a rock and a hard place here.

Q. You're telling me that you couldn't impose the death penalty in any fact situation.

A. I would prefer not to. I have a problem with doing that, personally.

Q. Well, you are entitled to have your scruples. Let me ask you this: Would the scruples that you have prevent you from considering the death penalty if appropriate in the present case?

A. If I had to consider it and there's a possibility that that, in fact, would be the verdict, then, I have a problem with it."

Based on this colloquy, the court excluded prospective juror Babbs for cause over defendant's objection.

The trial court's examination of the prospective juror Edward Glogowski proceeded as follows:

"Q. Do you have such scruples against the death penalty no matter what the facts may be?

A. I have never been in this position, but as far as I can honestly answer, I'd say yes.

Q. Would your scruples substantially impair your ability to determine guilt or innocence in accordance with the evidence and the law?

A. No.

Q. If the defendant is found guilty of first degree murder, could you consider all of the possible penalties available under State law, including the death penalty?

A. I'd have a problem with the death penalty.

Q. Would such scruples prevent you from considering the death penalty if appropriate in the present case?

A. I think I could consider it. I'm not sure I could vote for it. That's the only way I can answer it honestly.

Q. Would you automatically vote against the death penalty no matter what the facts might be?

A. I would try to be open to the facts, and I would not do it automatically. I would at least try to be open.

Q. Would you automatically vote for the death penalty no matter what the facts might reveal?

A. Absolutely not.

Q. Now, if the defendant is found guilty of first degree murder, a second hearing, a sentencing hearing will be held, two separate and distinct questions will be asked of you.

One, does the death penalty apply to the facts in this case?

Two, should the death penalty be applied to this particular defendant?

Can you consider each of these questions separately?

A. I think so. I really don't know. I keep thinking of my feelings about the death penalty and your question, if I could apply it to the defendant. Becau[s]e I have strong feelings against it. I would have a hard time applying it. I guess what you're asking—could I ask you a[ ] question?

Q. No. You tell me what your true feelings are about the death penalty.

A. I just have a problem with—I'm not sure the death penalty solves anything. I just don't know that taking a life just because someone took a life is a valid thing

for the State to do. I just don't feel that way about it. And if I had to apply it to the defendant, I would have a very hard time applying it. I would try to be open, but on the other hand, I just have some strong feelings.

Q. Well, if you were going to sit as a juror on this case, you are obliged to take an oath that you will decide the case on all of the evidence and in accordance with the law as the Court instructs you regardless of what your personal feelings are about the law.

Can you honestly take that oath?

A. I[t] would be difficult.

Q. Well, I—now, I want you to be honest. Only you know what your conscience is telling you.

A. My conscience is telling me taking a life is wrong in any case. It doesn't matter if the State's taking it or another human being is taking it. I feel that taking a life is wrong. It's just my personal belief."

Based on these answers, the court excused prospective juror Glogowski for cause over defendant's objection.

A member of the venire may not be removed for cause simply because he has scruples against capital punishment. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777-78.) In determining whether a prospective juror may be removed for cause because of his views toward the death penalty, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.

This court has held that in determining whether a venireperson's views would impair that person's performance as a juror, it is not necessary that the person express himself with "meticulous preciseness," and a trial judge need not follow a "set catechism" in posing

questions on *voir dire*. (*People v. Szabo* (1983), 94 Ill. 2d 327, 354; *People v. Gaines* (1981), 88 Ill. 2d 342, 356.) Moreover, the remarks made by a prospective juror during the examination must be considered not in isolation but as a whole. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 386.) The trial judge is in a "superior position to gauge the meaning of the prospective juror's responses" to the examination, and the judge's determination is therefore entitled to deference. *People v. Emerson* (1987), 122 Ill. 2d 411, 439.

Considering the entirety of the two prospective jurors' remarks, we do not believe that the trial judge erred in excusing them for cause because of their attitudes toward capital punishment. In the present case, both Babbs and Glogowski initially stated that their scruples against the death penalty would not substantially impair their ability to determine guilt or innocence in accordance with the law. Upon further questioning, however, both the prospective jurors averred that they would find it difficult to follow the law as instructed by the court. Thus, although each venireperson at one point stated that his or her views regarding the death penalty would not substantially impair the performance of his or her duties as jurors in accordance with the law, a review of their comments as a whole indicates otherwise. Accordingly, prospective jurors Babbs and Glogowski were properly excused for cause.

The defendant next argues that he was denied a fair trial when the trial judge permitted the prosecution to introduce into evidence a photograph depicting Alvin Smith, one of the victims, with Aurelia Veal, who was Smith's girlfriend. The defendant contends that the photograph improperly allowed the State to present evidence concerning the victim's family at the guilt-innocence phase of the proceedings.

At trial, Aurelia Veal testified as a life-and-death witness on behalf of the State. Veal explained that although she and Smith were not married, they had lived together for about five years. Veal said that she last saw Smith around 5 a.m. on the day he was killed. Veal identified the photograph of her and Smith. Over the defendant's objection, the photograph was admitted into evidence.

We find no error in the admission of the photograph. In contrast to *People v. Bernette* (1964), 30 Ill. 2d 359, cited by the defendant, the evidence complained of here was not presented in such a way that the jury could have considered it relevant to its determination of the defendant's guilt or innocence. The prosecution did not dwell on the photograph or emphasize Smith's relationship with Veal. The photograph was used simply to identify Alvin Smith and to establish his life and death. Considered in that context, the photograph could not have been prejudicial. See, *e.g., People v. Thompkins* (1988), 121 Ill. 2d 401, 446-47; *People v. Free* (1983), 94 Ill. 2d 378, 414-15.

The defendant contends that he was improperly restricted in the presentation of his defense when the trial court allowed him to cross-examine Shirley Garza on only one of some nine letters she had sent to the defendant while he was in jail after his arrest in the present case. Before this court, the defendant contends that the letters show the depth of his romantic relationship with Garza and thus support his contention that his actions were provoked by sudden and intense passion. We note that the defendant's argument on appeal is different from the contention he made in the trial court. At trial, the defendant argued that the letters were being offered as impeachment, because they showed conduct by Garza that was inconsistent with her testimony in this case. The trial judge allowed defense counsel to question Garza concerning only one letter, ruling that inquiry into

the contents of the remaining letters would be cumulative. The judge did, however, permit the counsel to establish the existence of the other letters.

Later in this opinion we conclude that the defendant was not entitled to have the jury instructed on the offense of second degree murder. Assuming, however, that such a theory would be available in the present case, we do not believe that Garza's letters to the defendant, written several months after the offenses here, would be relevant to the defendant's claim that he possessed a mitigating mental state at the time of the offenses. The letters expressed Garza's feelings, not the defendant's, and were written at a time somewhat remote to the events involved here. For these reasons, we do not believe that the letters would have been admissible under the theory now suggested by the defendant.

We also find no error in the original basis for the trial judge's ruling. The extent of cross-examination is within the discretion of the trial court. Absent a clear abuse of discretion resulting in manifest prejudice, a reviewing court will not disturb a judge's ruling. (*People v. Hubbard* (1973), 55 Ill. 2d 142, 150-51.) Moreover, a trial judge enjoys wide latitude in imposing reasonable limits on cross-examination to prevent repetitive interrogation, among other things. (*Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435.) In the present case, defense counsel was allowed to cross-examine Garza with respect to the contents of one of the letters. Counsel was also permitted to establish that Garza had sent other, similar letters to the defendant during December 1987 and January 1988, following his arrest here. An examination of these additional letters confirms their similarity to the one the witness was questioned about. Given these circumstances, we do not believe that the trial judge abused his discre-

tion in limiting defense counsel's cross-examination of Garza.

In a related argument, the defendant asserts that the additional letters written by Garza would also have been relevant at the second phase of the sentencing hearing because the information would have countered prosecution evidence, presented at sentencing, that the defendant had assaulted Garza several weeks before his commission of the offenses charged here. The defendant contends that he should therefore be granted a new sentencing hearing so that these additional letters can be presented to the jury. This contention, however, has been waived. The defendant made no attempt to introduce Garza's letters into evidence at the sentencing phase, and we therefore have no occasion to consider whether the letters would have been admissible at that point in the proceedings.

The defendant argues next that he was denied a fair trial by the State's cross-examination of his former wife, Triva Tenner. Over defense objection, the prosecutor questioned Triva about specific instances in which the defendant had physically abused her. The defendant argues that the questions were improper because they were intended to elicit evidence of the defendant's commission of other wrongs. See *People v. Lampkin* (1983), 98 Ill. 2d 418.

During cross-examination, the prosecutor asked Triva whether she was afraid of the defendant. The trial court sustained the defendant's objection to the question. In an offer of proof, the prosecutor explained that Triva, in a previous interview, had stated that she was afraid of the defendant and had related several instances of physical abuse committed by the defendant. The trial judge then reversed his earlier ruling, concluding that the State's proposed inquiry pertained to the witness' possible motive or bias, matters within the permissible range

of cross-examination. In the presence of the jury, the prosecutor then asked Triva whether she was afraid of the defendant; she responded in the negative. The prosecutor next questioned the witness about the instances of physical abuse. Triva confirmed that the defendant had injured her on at least two occasions.

"The general rule is that a witness may be cross-examined concerning those matters which would show the witness' bias, motive, or willingness to testify. [Citations.] However, the latitude of such an inquiry is within the discretion of the trial court. [Citation.]" (*People v. Thompkins* (1988), 121 Ill. 2d 401, 441.) The trial judge's decision will not be disturbed on appeal unless the defendant has sustained "manifest prejudice" as a result of the judge's determination. *Thompkins*, 121 Ill. 2d at 441-42; *People v. Brisbon* (1985), 106 Ill. 2d 342, 362.

We do not agree with the defendant that the prosecutor's inquiry was improper because it happened to disclose other wrongs committed by the defendant. To the extent that Triva's possible fear of the defendant might have caused her to testify favorably for the defense, that fear was relevant to her bias or motive as a witness and thus within the proper scope of cross-examination. (See *United States v. Cerone* (7th Cir. 1971), 452 F.2d 274, 288 (evidence of witness' fear may be presented as means of demonstrating bias, thus tending to discredit witness).) In the present case, the prosecutor's questions on cross-examination were an appropriate means of impeaching Triva's credibility and exposing her possible bias in appearing as a defense witness.

The defendant next complains of two comments made by the prosecutor in closing argument at the guilt-innocence phase. The defendant asserts that the challenged comments denied him a fair trial.

The defendant first contends that the prosecutor, in his comments, improperly attacked defense counsel. Dur-

ing rebuttal argument, the prosecutor stated, "Now, Counsel has seen fit to attack the Sauls about orgies. You have to dirty up—or the defendant I should say." The trial judge sustained defense counsel's objection to this comment. The prosecutor continued, "Anything the lawyers say—I am not telling you they are not telling the truth. They are telling you what their client told you. This is the guy not telling you the truth." The defendant again objected, but the trial judge did not rule on the objection. Later, in concluding his rebuttal, the prosecutor stated, "Well, everyone in this courtroom has responsibilities. Mr. Smith and I have the responsibility to prosecute James Tenner. The judge has the responsibility to see to it that he gets a fair trial. His attorneys have the responsibility to see to it that he has a defense or whatever he needs." No objection was made to this last statement. The defendant now argues that the series of comments represented an attack on defense counsel's integrity.

"The character and scope of argument is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge had performed his duty and properly exercised the discretion vested in him." (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) Remarks made in argument will be deemed reversible error only if they are both improper and so prejudicial that "real justice [was] denied or that the verdict of the jury may have resulted from the error." (*People v. Yates* (1983), 98 Ill. 2d 502, 533.) Reversal is not warranted if the State's evidence of guilt is "substantial and *** not closely balanced." *People v. Henderson* (1990), 142 Ill. 2d 258, 323.

We do not believe that the jury would have interpreted the quoted comments as an attempt to impugn the integrity of defense counsel. The prosecutor was instead challenging the veracity of the defendant, who had

testified, and whose credibility was therefore at issue. "It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based upon competent and pertinent evidence. [Citations.]" (*People v. Miller* (1958), 13 Ill. 2d 84, 109.) We note that the prosecutor, in his initial comment, immediately corrected himself when he mistakenly referred to defense counsel rather than to the defendant. Moreover, the trial judge sustained the defendant's objection to that comment. The prosecutor then went on to clearly and specifically state that he was not asserting that defense counsel was lying.

For these reasons, we believe that the instant case is distinguishable from *People v. Emerson* (1983), 97 Ill. 2d 487, on which the defendant relies. In *Emerson*, the prosecutor suggested to the jury that the defense attorneys created a smokescreen of lies and innuendo and that they attempted to "dirty up" the victim to distract the jury from the defendant's crime. This court found the statements, when combined with other comments, to be so prejudicial that they constituted reversible error. The court characterized the prosecution's statements as purporting to "charge counsel with fabrication of a defense bordering on subornation of perjury." (*Emerson*, 97 Ill. 2d at 499.) In the present case, the prosecutor's comments were directed at the defendant, not at counsel, and were fair inferences from the conflicting testimony in this case.

In another challenge to the State's closing argument at trial, the defendant contends that the prosecutor misstated the law concerning first degree murder and attempted first degree murder. In describing the State's burden of proof, the prosecutor said that the State was required to prove that the defendant "shot and killed Donna Sauls and Alvin Smith, and we have to prove that he almost killed Albert Sauls." The defendant contends

that the remark was erroneous because it omitted any reference to the mental states necessary to support convictions for those offenses.

Defense counsel failed both to object to the comment and to raise the matter in the defendant's post-trial motion, and has thus waived any objection to the remark. (*People v. Shum* (1987), 117 Ill. 2d 317, 340; *People v. Whitehead* (1987), 116 Ill. 2d 425, 446.) And contrary to the defendant's view, we do not believe that the remark rises to the level of plain error. (134 Ill. 2d R. 615(a); see *Whitehead*, 116 Ill. 2d at 446-47.) The comment did not cause substantial injustice to the defendant (*People v. Pastorino* (1982), 91 Ill. 2d 178, 192), nor did it "effectively deprive [the] defendant of a fair trial [as the] evidence [of guilt] was substantial and not closely balanced" (*People v. Henderson* (1990), 142 Ill. 2d 258, 322-23). In his remarks immediately preceding the comment challenged here, the prosecutor explained that the State was not required to prove premeditation or motive; in that context, the challenged remark would have been seen as representing simply an abbreviated description of the prosecution's actual burden in the case. Moreover, the jury received complete definitions of first degree murder and attempted first degree murder from the prosecutor in other portions of his argument, and the trial judge properly instructed the jury on the correct definitions of those offenses. Finally, the evidence of guilt in this case was not closely balanced. The two surviving victims of the offenses testified at trial, describing in detail the defendant's commission of these offenses. We therefore hold that the challenged comment did not constitute plain error.

The defendant next argues that the trial judge erred in refusing to instruct the jury on the offense of second degree murder. The defendant maintains that the evidence in this case justified instructing the jury on both

forms of the offense: sudden and intense passion resulting from serious provocation, and unreasonable belief in justification. Ill. Rev. Stat. 1987, ch. 38, pars. 9—2(a)(1), (a)(2).

Section 9—2(a) of the Criminal Code of 1961 provides:

"A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (1) of Section 9—1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a).

The defendant first contends that there was sufficient evidence of sudden and intense passion to warrant a second degree murder instruction. He argues that the victims' threats toward him, when considered with his relationships to the victims, constituted sufficient evidence of provocation serious enough to incite sudden and intense passion. We disagree. This court has held that the " 'only categories of serious provocation which have been recognized are: "substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property." ' " (Emphasis omitted.) (*People v. Fausz* (1983), 95 Ill. 2d 535, 539, quoting *People v. Crews* (1967), 38 Ill. 2d 331, 335-36; see *People v. Chevalier* (1989), 131 Ill. 2d 66, 71; *People v. Simpson* (1978), 74 Ill. 2d 497.) Although these categories were

announced in connection with the predecessor offense of voluntary manslaughter, they would apply equally to second degree murder, which replaced the former offense effective July 1, 1987. (See Pub. Act 84—1450, §2, eff. July 1, 1987.) The elements of the two offenses are essentially the same; the difference between the two statutes concerns the parties' burdens of production and persuasion. Compare Ill. Rev. Stat. 1985, ch. 38, par. 9—2, with Ill. Rev. Stat. 1987, ch. 38, par. 9—2.

"Passion on the part of the slayer, no matter how violent, will not relieve [him] from liability for murder unless it is engendered by a provocation which the law recognizes as being reasonable and adequate." (*People v. Austin* (1989), 133 Ill. 2d 118, 125.) The record in this case clearly demonstrates that none of the recognized categories of provocation were present here. The defendant was not the victim of an injury or assault or the subject of an illegal arrest. There was no evidence of mutual combat; indeed, the victims did not physically resist the defendant. Nor could there have been any question of adultery, for the defendant had never been married to Shirley Garza, and, in any event, their relationship had ended some time prior to the offenses here. See *People v. McCarthy* (1989), 132 Ill. 2d 331, 342.

In addition, we note that the defendant's preparation preceding the murders and his avowed aim of "rescuing" Garza from the Saulses contradict any claim that he was acting from sudden and intense passion resulting from serious provocation. The defendant carefully prepared rope restraints and, in his garage, hung three nooses of differing lengths. The defendant held the four victims at gun point for more than two hours, and later shot three of the victims. These preparations and the defendant's previously formulated idea of "rescuing" Garza belie the defendant's contention that he was acting from a sudden and intense passion. For these rea-

sons, we conclude that this form of second degree murder was not available to the defendant, and that the evidence in this case did not warrant instructing the jury on this theory.

The defendant also argues that the trial judge erred in refusing to instruct the jury on the alternative form of second degree murder, unreasonable belief in justification. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(2).) At trial, the defendant testified that the victims threatened him and his family and that he had previously overheard the Saulses plotting to kill him. This evidence, the defendant contends, was sufficient to warrant instructing the jury on the additional theory of second degree murder. We do not agree.

Because the defendant was the aggressor, this form of second degree murder was also unavailable to him. Section 7—4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 7—4(a)), regarding use of force by an aggressor, provides that a defendant's use of force is not justified if the defendant is "attempting to commit, committing, or escaping after the commission of, a forcible felony." (Ill. Rev. Stat. 1987, ch. 38, par. 7—4(a).) In the present case, the defendant's conduct in arming himself with a shotgun and preparing ropes with which to bind the victims established that he was attempting to commit or committing a forcible felony; indeed, the defendant was found guilty of four counts of aggravated unlawful restraint (Ill. Rev. Stat. 1987, ch. 38, par. 10—3.1), a forcible felony (Ill. Rev. Stat. 1987, ch. 38, par. 2—8), for that conduct. Because section 7—4(a) of the Criminal Code precludes the defendant from asserting any claim of justifiable use of force, he may not claim an unreasonable belief in justification that would warrant the giving of an instruction on the "unreasonable belief" form of second degree murder. See *People v. Sloan* (1986), 111 Ill. 2d 517, 521.

For these reasons, we conclude that the trial court was correct in refusing to instruct the jury on either form of second degree murder. *Beck v. Alabama* (1980), 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382, cited by the defendant, does not require a different result. In *Beck*, the Supreme Court considered an Alabama statutory scheme that prohibited a judge from giving a jury the option of convicting a defendant of a lesser included offense in capital cases. Defendants thus were either acquitted or found guilty of the capital offense. The Supreme Court held that the death penalty could not be imposed in those circumstances. (*Beck*, 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382.) Illinois law does not contain a similar restriction. In the present case, the defendant's tendered instructions were not supported by the evidence, and thus they were properly refused.

In view of our determination here, we need not consider the defendant's additional argument on appeal that certain rulings made by the trial judge during opening statement unduly restricted defense counsel's ability to present a defense based on second degree murder.

In his next contention, the defendant argues that he was denied the effective assistance of counsel at trial. Defense counsel, in opening statement and closing argument, acknowledged that the defendant prepared the rope restraints used to bind the victims and that the defendant fired shots at the victims. Counsel contended, however, that the defendant was concerned about Shirley Garza's safety and was acting from emotion and passion. The defendant, in his testimony, similarly admitted that he prepared the rope restraints used to tie the victims and that he shot Donna Sauls, Albert Sauls, and Alvin Smith. The defendant insisted that he was fearful of the victims and that he was acting in passion. As we have noted, at the close of evidence the trial judge refused to instruct the jury on either form of second de-

gree murder. Defense counsel did not tender a necessity instruction. See Ill. Rev. Stat. 1987, ch. 38, par. 7—13.

In a series of interrelated arguments, the defendant now contends that he was denied the effective assistance of counsel by the circumstances related above. The defendant notes that the jury received instructions on the different forms of first degree murder, including felony murder, and that aggravated unlawful restraint was used as one of the predicate felonies for felony murder. The defendant thus argues that his concession to the offense of aggravated unlawful restraint required the jury to find him guilty of first degree murder at least under a felony murder theory. In addition, the defendant contends that counsel should have tendered a necessity instruction, once it became apparent that the defendant's testimony indicating that he was guilty of aggravated unlawful restraint was going to effectively deny him instructions on second degree murder. An instruction on necessity, the defendant argues, would have given the jury the opportunity to acquit him of that felony, and thus would have nullified the effect of the defendant's admission. The defendant believes that counsel failed to function as an adversary and meaningfully test the strength of the State's case and that prejudice must therefore be presumed.

In *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2067, the Supreme Court held that a defendant alleging ineffective assistance of counsel must establish both that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (See *People v. Albanese* (1984), 104 Ill. 2d 504 (adopting *Strickland* standard).) In certain situations, as when counsel fails to subject the prosecution's case to meaningful adversary testing, prejudice will be presumed

without application of the second part of the *Strickland* standard. *Strickland,* 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067; see also *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039; *People v. Hattery* (1985), 109 Ill. 2d 449.

The defendant contends that counsel failed to subject the prosecution's case to meaningful adversary testing. The defendant thus believes that we must dispense with the prejudice prong of the *Strickland* test and presume that the defendant sustained prejudice as a consequence of counsel's representation. We do not agree.

The record discloses that counsel mounted a vigorous defense in the present case. Counsel thoroughly cross-examined the prosecution witnesses, made appropriate objections to argument and testimony, and introduced evidence in support of the defense theory of the case. That counsel acknowledged the defendant's performance of the acts forming the basis for the charges here does not compel a different result. In the present case, counsel was attempting to show that the defendant was acting under a mitigating mental state that would have reduced the severity of the homicides from first degree murder to second degree murder. "It is not at all unusual for a defendant facing a murder charge to argue that he is guilty instead of a less serious offense, such as voluntary manslaughter. [Citations.]" (*People v. Page* (1993), 155 Ill. 2d 232, 262.) Because the defendant's own testimony corresponded to the statements made by defense counsel, we must assume that the defendant consented to this strategy. *Cf. Hattery* (defense counsel acknowledged defendant's commission of charged murders; defendant's consent to strategy not apparent on record; counsel failed to advance theory of defense, present evidence, or make closing argument).

Because we will not presume prejudice under *Cronic* or *Hattery,* we must, then, evaluate the defendant's inef-

fective-assistance claim under the *Strickland* standard. As we have noted, this requires the defendant to establish a deficiency in counsel's performance that was prejudicial to the defendant. A court need not examine both questions if the defendant is unable to establish that he has been prejudiced as a result of counsel's alleged deficiency. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

The defendant argues that his counsel's failure to tender an instruction on necessity, once having admitted to aggravated unlawful restraint, was ineffective assistance under *Strickland*. Under *Strickland*'s second prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) We cannot state that there was a reasonable probability that, but for counsel's deficient performance, the result of the defendant's trial would have been different.

The elements of the defense of necessity are that the person asserting the defense was "without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." (Ill. Rev. Stat. 1987, ch. 38, par. 7—13.) No conceivable interpretation of the facts in this case would support the giving of a necessity instruction. The defendant developed and orchestrated the entire situation. Further, it cannot be reasonably asserted that the defendant had no other choice but to restrain and then execute the victims. Because the evidence would not have warranted the giving of a necessity instruction, we conclude that a necessity instruction, if tendered, would have been rejected. Accordingly, we find that the outcome would not have changed and that

the defendant's trial counsel did not provide ineffective assistance.

The defendant next argues that the trial judge erred in the response he gave to a question from the jury about the instructions on the charge of attempted first degree murder. The defendant was charged with the attempted first degree murder of Albert Sauls. One of the jury instructions stated, "A person commits the offense of attempt when he, with intent to commit the offense of first degree murder, does any act which constitutes a substantial step toward the commission of the offense of first degree murder." Another instruction provided, "A person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, he intends to kill Albert Sauls."

During deliberations, the jurors sent the trial judge a note indicating that they were confused about the instruction defining attempted murder as performing an act "intending to kill Albert Sauls." The prosecution suggested that the judge inform the jury that this was the definition of murder that accompanied the instructions on attempted first degree murder. Over the defendant's objection, the trial court responded with a note stating, "That instruction applies to the attempt murder charge in conjunction with the other instructions." The defendant argues that the trial judge's answer allowed the jury to consider all the different definitions of first degree murder that were presented to the jury, including felony murder, and that the jury might therefore have found him guilty of the attempt even in the absence of a specific intent to kill. See *People v. Harris* (1978), 72 Ill. 2d 16.

We agree with the defendant that the trial judge erred in his response to the jury's inquiry. The note allowed the jury to convict the defendant of attempted first degree murder without necessarily finding that the

defendant had possessed a specific intent to kill the victim. We believe that the defendant's conviction for attempted first degree murder must therefore be vacated.

We do not agree with the defendant, however, that his two convictions for murder must also be reversed. With respect to Alvin Smith and Donna Sauls, the jury returned general verdicts finding the defendant guilty of their murders. A "general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable. [Citations.]" (*People v. Lymore* (1962), 25 Ill. 2d 305, 307-08.) Thus, even if the defendant's conviction for attempted murder is reversed, which means that he could not have been found guilty of felony murder based on that offense, his convictions for murder may still stand. There were other good charges of murder to which the proof was applicable: first degree intentional murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)), first degree murder based on acts creating a strong probability of death (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2)), and felony murder based on aggravated unlawful restraint (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3)). As no challenge has been made to these three theories of the offense, there is no need to reverse the defendant's convictions for first degree murder.

## II

The defendant argues that unreliable hearsay testimony of violent acts committed by him was erroneously admitted into evidence during the second stage of the sentencing hearing. The defendant alleges two specific instances of error. First, the defendant objects to the testimony of Rockford Police Sergeant Steve Pirages. Pirages stated that he interviewed Rita Darr, a girlfriend of the defendant, in January 1990. Pirages testified that Darr told him that the defendant possessed a bad temper, was jealous, and had physically abused her

during their relationship. According to Pirages, Darr also related an incident that had occurred seven years earlier in which the defendant drove Darr to a rural area near Rockford and ordered her out of the car and into a field while holding what Darr believed to be a weapon. The defendant later allowed Darr to return to the car. When the defendant stopped for gas, Darr called the police but fled before they arrived. Sergeant Pirages produced a certified copy of a petition for an order of protection filed by Darr against the defendant. The petition contained Darr's allegations that the defendant had threatened and tortured her on several occasions.

The defendant also objects to the testimony of Police Captain Dennis Boyd of the South Chicago Heights police department. Captain Boyd testified that on August 17, 1987, Shirley Garza came into the police station and related to him that the defendant had entered her car while she was stopped at an intersection, pulled out a knife, and cut her on the abdomen and arm. Boyd stated that Garza told him that the defendant had held her at knife point from 6 o'clock the preceding evening until 2 o'clock the next morning. Boyd also testified that he advised Garza to contact the State's Attorney to press charges, but that she later called back and informed him that she would not be filing a complaint.

Wide latitude is granted to the parties in introducing evidence in aggravation and mitigation at a capital sentencing hearing. The testimony presented need not satisfy the more restrictive rules of evidence that govern the guilt-innocence phase. (*People v. Johnson* (1986), 114 Ill. 2d 170, 205; *People v. Free* (1983), 94 Ill. 2d 378, 426-27; Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e).) Rather, evidence will be admitted if it is relevant and reliable. (*People v. Gosier* (1991), 145 Ill. 2d 127, 151.) The determination of relevance and reliability is within the trial judge's discretion. *People v. Jackson* (1991), 145 Ill. 2d

43, 115; *People v. Richardson* (1988), 123 Ill. 2d 322, 361-62; *People v. Brisbon* (1985), 106 Ill. 2d 342, 365.

The defendant contends that the testimony of the two officers should not have been admitted into evidence because it did not bear sufficient indicia of reliability. Specifically, the defendant complains that the testimony was not corroborated by other evidence, was challenged by defense counsel, and was derived from parties who were biased against the defendant.

We find no abuse of discretion in the introduction of this testimony. The officers in question had personally interviewed the complaining witnesses. On cross-examination, defense counsel was able to inquire fully into the circumstances of the officers' reports. The hearsay nature of otherwise reliable evidence does not bar its admission at a sentencing hearing. (*Richardson*, 123 Ill. 2d at 362; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498.) Captain Boyd's testimony concerning the assault on Garza was based on information compiled prior to the offenses charged here. (See *People v. Morgan* (1986), 112 Ill. 2d 111, 144.) Sergeant Pirages' testimony concerning the defendant's actions toward Rita Darr was corroborated by a certified copy of a petition for an order of protection signed by Darr.

The defendant makes the related argument that his sixth amendment right to confrontation was violated by the presentation of the police officers' hearsay testimony. This court has stated, however, that "it is well settled that a defendant in a capital case has no due process right to cross-examine all out of court sources of information relied upon in sentencing. [Citation.]" (*People v. Jones* (1982), 94 Ill. 2d 275, 286-87; see *Brisbon*, 106 Ill. 2d at 365.) We must therefore reject this additional contention.

The defendant next argues that he was denied a fair sentencing hearing when the trial judge refused his re-

quest to address the jury without being placed under oath or being subject to cross-examination. We have consistently held, however, that there is no statutory or constitutional right to allocution at a capital sentencing hearing. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 280-82; *People v. Christiansen* (1987), 116 Ill. 2d 96, 127-29; *People v. Gaines* (1981), 88 Ill. 2d 342, 374-79.) The defendant has presented no grounds that would warrant our reconsideration of those decisions.

The defendant also contends that his right to a fair sentencing hearing was denied when the trial court refused a defense request that defense counsel be allowed to make opening and rebuttal arguments at the conclusion of the second stage of the sentencing hearing. Consistent with custom, the judge instead allowed the prosecution to deliver those arguments. The defendant asserts that the burden of persuasion at that stage of the proceedings rests on the defense, and that the defense therefore should be allowed to argue first and last.

The death penalty statute, however, does not impose the burden of proof on a defendant at the second stage of a capital sentencing hearing. "Rather, the State bears the burden of going forward with factors in aggravation and the defendant has the burden of going forward with evidence of mitigating factors. (*People v. Fields* (1990), 135 Ill. 2d 18, 73; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46.)" (*People v. Simms* (1991), 143 Ill. 2d 154, 184.) Moreover, we have previously determined that the State, as the moving party at the sentencing hearing, is entitled to present both opening and rebuttal argument. (*People v. Ramirez* (1983), 98 Ill. 2d 439, 468-69; *People v. Williams* (1983), 97 Ill. 2d 252, 302-03.) We decline the defendant's invitation to reconsider those holdings.

The defendant next raises four allegations of error with respect to the State's closing argument at the sec-

ond stage of the sentencing hearing. The defendant first contends that the prosecution improperly argued that the defendant would commit crimes in the future if he were not sentenced to death in the present case. Referring to the circumstances surrounding the defendant's arrest, the prosecutor observed that the defendant, after he had been stopped by police following the murders, made a downward motion toward where the officers later discovered a fully loaded shotgun. The prosecutor then argued that the defendant's movement toward the gun, as well as the presence of the two women in the car, suggested that the defendant would have killed other persons if he had not been apprehended.

We believe that the defendant has misconstrued the substance of the prosecutor's remarks. The prosecutor was not arguing that the defendant would kill again if the jury failed to impose the death penalty in the present case; this court has previously expressed its disapproval of comments of that nature. (See, *e.g., People v. Holman* (1984), 103 Ill. 2d 133, 163; *People v. Szabo* (1983), 94 Ill. 2d 327, 366-67.) Rather, the prosecutor's comments related solely to what actions the defendant was prepared to take immediately prior to his arrest. These comments were based on reasonable inferences from the evidence adduced at trial and were therefore proper. (*People v. Burnett* (1963), 27 Ill. 2d 510, 517.) A loaded shotgun was discovered in the car in which two women, one of whom was a witness to the earlier murders, were riding. In addition, Shirley Garza testified that the defendant had threatened to kill her. It was therefore not unreasonable to infer that the defendant was prepared, at that time, to kill more persons.

The defendant next argues that the prosecutor misstated the law when he told the jury, in rebuttal argument, that "our legislature has seen fit that in a double homicide that the punishment, the appropriate punish-

ment is death." The defendant contends that this comment could have led the jury to believe, incorrectly, that death was the mandatory sentence in this case.

Considering these remarks in context, we do not believe that the jury could have been misled. Defense counsel objected to the comment; without expressly ruling on the objection, the trial judge stated, "The Court will instruct the jury, yes. You both know it." The prosecutor then told the jurors that the defendant would be sentenced to death if they unanimously found no mitigating factors sufficient to preclude imposition of that sentence. The jurors were accurately instructed on their role in the sentencing process, and on their duty to consider the parties' extensive evidence in aggravation and mitigation. We do not believe that the prosecutor's brief remark could have caused the jury to believe that death was a mandatory sentence in this case.

The defendant next contends that the prosecutor argued facts that were not supported by the record. Specifically, the defendant objects to the prosecutor's comment, made in rebuttal argument, that defense counsel "knows where she [i.e., Rita Darr] is at." Defense counsel had listed Darr as a potential witness in its answer to discovery; the prosecutor was apparently responding to defense counsel's earlier argument questioning why Darr herself had not been called to testify.

The trial judge sustained defense counsel's objection to the prosecutor's comment, and we believe that the ruling would have been sufficient to overcome whatever prejudicial effect the comment might otherwise have engendered. "[A]lthough the prejudicial effect of an improper argument cannot always be erased from the minds of the jurors by an admonishment from the court [citation], the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice.

[Citations.]" *(People v. Baptist* (1979), 76 Ill. 2d 19, 30.) The trial judge's ruling sustaining the defendant's objection would have been similarly effective here. The jury was instructed on the purpose of closing argument, as well as on the effect of a ruling sustaining a party's objection.

In his last challenge to the prosecutor's argument, the defendant contends that the prosecutor improperly told the jury that the responsibility for executing the defendant rested elsewhere. The prosecutor told the jury, "And, believe me no one in this room, Mr. Smith and I are not trying to put anything on you. And, don't let the defense put anything on you. It is the people of the State of Illinois who will carry out this execution. Not you. You have been asked to follow the law." The defendant now argues that the comments served to minimize the importance of the jury's role in the sentencing process, in violation of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633. In *Caldwell*, the Court found constitutional error in a prosecutor's arguments that the decision of the sentencing jury was not final because it would be subject to judicial review. The trial judge in *Caldwell* overruled defense objections to the remarks.

In the present case, the defendant has waived any objection to the prosecutor's comments. Defense counsel neither objected to the remarks at the sentencing hearing nor raised the issue in the motion for a new sentencing hearing. *(People v. Shum* (1987), 117 Ill. 2d 317, 340; *People v. Whitehead* (1987), 116 Ill. 2d 425, 446.) Contrary to the defendant's view, we do not believe that the comments rise to the level of plain error. (See 134 Ill. 2d R. 615(a).) The court correctly instructed the jury on its role in the sentencing process, and the parties repeatedly reminded the jury of its function in that regard. We note, too, that the prosecutor's comment was similar to

one made by defense counsel in his opening statement at the second stage of the sentencing hearing. On that occasion, defense counsel told the jurors that "the only question that faces you for James Tenner [is] whether or not [the] government will take his life or whether or not he will live the rest of his natural life in prison."

The defendant also contends that death is an excessive and inappropriate sentence in this case. The defendant argues that his conduct in the present case, as well as his background and personal record, are as favorable as those of the defendants in cases in which the death sentence has been found excessive. (See *People v. Leger* (1992), 149 Ill. 2d 355; *People v. Johnson* (1989), 128 Ill. 2d 253; *People v. Buggs* (1986), 112 Ill. 2d 284; *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Carlson* (1980), 79 Ill. 2d 564.) The defendant points to his disadvantaged youth, his history of productive labor, his having fathered 10 children, and his help to those around him, as well as to the "unique and unfortunate set of circumstances, intertwined with passion, fear, jealousy, emotion, and [defendant's] desire to protect someone," which, he contends, gave rise to the present offenses.

We are unable to conclude that the death penalty is an excessive sentence in the present case. In determining whether a sentence of death is excessive, we will consider "whether the circumstances of the crime *** are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty." (*Johnson*, 128 Ill. 2d at 280.) We are aware of the circumstances that preceded the present offenses. Nevertheless, the State presented significant evidence in aggravation. The record discloses a substantial amount of preparation by the defendant in advance of the crimes. Moreover, the defendant held the victims captive for more than two hours, confining them in nooses and rope bindings. The defendant later shot three

of the victims in an execution style; two of the victims died, and a third narrowly escaped death. Our review of this record indicates that the defendant's sentence is not excessive and that the deterrent and retributive aspects of that sentence will be served.

The defendant also contends that he is entitled to a new sentencing hearing if the conviction for attempted murder is vacated. We do not agree. Defendant submits that an aggravating factor, felony murder based on attempted murder, has been invalidated by our reversal of his conviction for attempted murder. This, he argues, requires that he be granted a new sentencing hearing. However, during the eligibility stage of the sentencing hearing, the only aggravating factor the jury was instructed to consider was whether the defendant had killed two or more people. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3).) Because felony murder based on attempted murder did not serve as a predicate for the defendant's eligibility for the death sentence, vacatur of the attempted murder conviction can have no bearing on the eligibility determination. In addition, we do not consider that the now-vacated conviction for attempted first degree murder could have had any effect on the determination made by the jury at the second stage of the sentencing hearing. We believe that any error in that regard was harmless, a finding that we are entitled to make on review. (See *Clemons v. Mississippi* (1990), 494 U.S. 738, 741, 108 L. Ed. 2d 725, 733, 110 S. Ct. 1441, 1444; *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 376-77.) The defendant's other convictions for the offenses committed in this case, together with the other evidence in aggravation introduced by the State, provided the sentencing jury with ample grounds on which to base its sentence; the presence or absence of an additional conviction for attempted first degree murder would not have altered its determination.

As a final matter, we note that the defendant was sentenced to four concurrent terms of five years' imprisonment for his four convictions for aggravated unlawful restraint, to a concurrent term of 30 years' imprisonment for the attempted first degree murder conviction, and to a concurrent term of 30 years' imprisonment for the armed violence conviction. Because we have vacated the conviction for attempted first degree murder, the sentence corresponding to that office must also be vacated. Additionally, the defendant asks that the cause be remanded for resentencing because the notice of appeal was filed prior to the imposition of the sentences of imprisonment (see *People v. Scott* (1977), 69 Ill. 2d 85), and that the conviction and sentence for armed violence be vacated, apparently on the ground that the conviction is redundant (*People v. Payne* (1983), 98 Ill. 2d 45). We do not believe that either action is necessary. In the exercise of our supervisory authority, we affirm the sentences of imprisonment imposed by the trial judge for the offenses of aggravated unlawful restraint and armed violence. The conviction for armed violence was based, at least in part, on the defendant's actions toward Albert Sauls. With the conviction for attempted first degree murder having been vacated, we believe that the separate conviction and sentence for armed violence may stand.

The defendant also raises a number of challenges to the constitutionality of various provisions of the death penalty statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). This court has previously rejected these same contentions, and the defendant has presented no reasons that would warrant our reaching a different result in the present case.

We have previously determined that the death penalty statute is not invalid for failing to require the jury to make a separate determination that death is the appro-

priate punishment in the case. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 462; *People v. Montgomery* (1986), 112 Ill. 2d 517, 534; *People v. Stewart* (1984), 105 Ill. 2d 22, 76-77.) So, too, this court has rejected the defendant's argument that the statute places on the defendant a burden of proof that effectively bars meaningful consideration of mitigating evidence (*People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; *People v. Hampton* (1992), 149 Ill. 2d 71, 116-17), as well as his argument that the statute is invalid due to the discretion it affords the prosecutor in determining whether to seek the death penalty (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43).

We have also held that the statute does not place on a defendant the risk of nonpersuasion at the sentencing hearing (*People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Caballero* (1984), 102 Ill. 2d 23, 49), and is not invalid for failing to require the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude imposition of the death penalty (*People v. Stewart* (1984), 105 Ill. 2d 22, 76).

The defendant next argues that the death penalty statute fails to provide sufficient information-gathering procedures to insure adequate appellate review and fails to provide for proportionality review. This court, however, has held that the statute affords sufficient information-gathering procedures. (*People v. Albanese* (1984), 104 Ill. 2d 504, 541-42.) Further, proportionality review is not required by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and our State statute does not mandate such review (*People v. King* (1986), 109 Ill. 2d 514, 551; *Stewart*, 104 Ill. 2d at 499; *Kubat*, 94 Ill. 2d at 502-04). We decline to reconsider these holdings.

The defendant next argues that various aspects of the death penalty statute, individually and working in combination, invite the arbitrary and capricious imposition of that sentence. The defendant challenges the individual and cumulative effect of the following components of the death penalty statute: (1) preclusion of the sentencer's consideration of the exact range of applicable sentences other than death; (2) absence of required written findings by the sentencer; (3) absence of required pretrial notice; (4) absence of requirement that all evidence in aggravation be made known to, or made discoverable by, the defendant before trial; and (5) language in the statute that may lead the sentencer to place the burden of proof on the defendant or that creates a presumption that death is the appropriate sentence. This court has, on other occasions, rejected the same arguments against the statute. Thus, it has been held that the statute does not create a presumption that the death penalty is appropriate (*Stewart*, 105 Ill. 2d at 76-77) and that it does not improperly shift the burden of proof to the defendant (*Whitehead*, 116 Ill. 2d at 465). Further, in *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43, this court rejected the defendant's remaining challenges to the statute. We therefore once again find that "[i]f all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." *Phillips*, 127 Ill. 2d at 542-43.

For the reasons stated, the judgment of the circuit court of Cook County is reversed as to the conviction for attempted murder and affirmed in all other aspects. The clerk of this court is directed to enter an order setting Tuesday, January 25, 1994, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1992)). The clerk of this court shall send a certi-

fied copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed in part*
*and vacated in part.*

JUSTICES HARRISON, McMORROW and NICKELS took no part in the consideration or decision of this case.