NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of

the opinion to request a rehearing. Also, opinions are subject to

modification, correction or withdrawal at anytime prior to issuance of the

mandate by the Clerk of the Court. Therefore, because the following slip

opinion is being made available prior to the Court's final action in this

matter, it cannot be considered the final decision of the Court. The official

copy of the following opinion will be published by the Supreme Court's

Reporter of Decisions in the Official Reports advance sheets following final

action by the Court.

                                       

                 Docket No. 76907--Agenda 12--September 1995.

      THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FRANK WILLIAMS,

                                  Appellant.

                                       

                         Opinion filed May 31, 1996.

                                       

                                       

     CHIEF JUSTICE BILANDIC delivered the opinion of the court:

     Following a jury trial in the circuit court of Cook County, defendant,

Frank Williams, was convicted of first degree murder (Ill. Rev. Stat. 1991,

ch. 38, pars. 9--1(a)(1)), attempted murder (Ill. Rev. Stat. 1991, ch. 38,

par. 8--4), and aggravated battery with a firearm (Ill. Rev. Stat. 1991, ch.

38, par. 12--4.2(a)). Defendant waived a jury for sentencing. The trial court

found defendant eligible for the death penalty based on the statutory

aggravating factor that the murder was committed in a cold, calculated, and

premeditated manner. Ill. Rev. Stat. 1991, ch. 38, par. 9--1(b)(11). The

trial court further found that there were no mitigating factors sufficient to

preclude imposition of the death penalty. Accordingly, the trial court

sentenced defendant to death. The trial court also sentenced defendant to

concurrent 30-year sentences for attempted murder and aggravated battery

with

a firearm. Defendant's death sentence has been stayed pending direct review

by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a).

For the following reasons, we affirm defendant's convictions and sentences.

                                     FACTS

     On January 3, 1991, at approximately 6 p.m., Anthony Cole drove Michelle

Brueckmann, Noel Garcia and Francisco Mashane to Michelle's house at 1312

South Maple in Berwyn, Illinois. Anthony and Michelle went into the house

while Noel and Francisco remained in the car, which was double-parked in

front of Michelle's house. Anthony testified that around 6:30 p.m., he and

Michelle were leaving the house and walking toward the street, when

defendant

emerged from behind a van. Defendant screamed, "I told you I was going to

kill you when I saw you together." Defendant then pointed a .38-caliber

revolver at Anthony and shot him in his left shoulder. Anthony fell to the

ground. Anthony next saw defendant grab Michelle and heard a gunshot.

Anthony

witnessed Michelle fall to the ground. Anthony got up and ran. Defendant

chased Anthony and shot him in the right shoulder. Anthony then ran into a

building for help.

     Noel Garcia confirmed Anthony's testimony. Garcia testified that, after

defendant shot Anthony, defendant ran up behind Michelle, grabbed her hair

and put the gun to her head. Defendant then shot Michelle in the head.

Michelle fell to the ground. Next, Garcia saw Anthony get up and start

running. Defendant ran after Anthony and shot him again.

     Berwyn police officers Cladio Paolucci and Ronald Volanti responded to

a call of shots fired in the 1300 block of South Maple in Berwyn. When they

arrived at the scene at approximately 6:35 p.m., they saw Michelle lying on

the parkway, bleeding profusely from the head with no apparent signs of life.

The officers also found Anthony lying on the kitchen floor of an apartment

next door. He was bleeding from the chest and shoulder. After talking to

Anthony, Officer Paolucci made a radio dispatch indicating that the

offender's name was Frank Williams, that he was a black male, approximately

6 feet, 2 inches tall, and 180 pounds.

     Berwyn police detective Mark Cione obtained an arrest warrant for

defendant that same night. After learning that defendant might be staying at

a house at 5024 South Winchester in Chicago, Detective Cione and other

police

officers proceeded to that address. They arrived at that address around 3

a.m. on January 4, 1991. When they arrived, Detective Cione rang the bell and

spoke with defendant's sister, Kimberly Alexander, who indicated that she had

not seen defendant. She then gave the officers permission to enter the house

to look for defendant. They found defendant in a storage area in the attic.

Detective Cione placed defendant under arrest and handcuffed him. After

taking defendant to the backyard, Detective Cione conducted a patdown search

of defendant and asked him if he had any guns, knives or needles on him.

Defendant responded that he did not, but said that he had a gun in his coat

located in the attic. Detective Cione radioed Officer Paolucci, who was still

in the attic, and told him to look for a jacket with a gun in it. Officer

Paolucci found a jacket lying in the corner of the storage area. A .38-

caliber revolver containing a few live rounds was in the pocket. Defendant

was then taken to the Berwyn police station.

     Assistant State's Attorney Kathleen White testified that she arrived at

the Berwyn police station around 5:30 a.m. on January 4, 1991, and spoke

with

defendant. Assistant State's Attorney White advised defendant of his Miranda

rights and he indicated that he understood them. Defendant agreed to give an

oral statement but he refused to sign anything. Defendant discussed what had

happened on January 3, 1991. Defendant stated that he became upset when

he

saw his girlfriend Michelle with his friend Anthony at a shopping mall during

the afternoon of January 3, 1991. Later that evening, defendant took a loaded

.38-caliber revolver from his dresser and drove to Michelle's house.

Defendant stated that he parked the car around the corner from Michelle's

house and stood behind a tree and waited for Michelle to come out of the

house. When Michelle and Anthony came out of the house, defendant emerged

from behind the tree with a loaded gun in his hand. Defendant walked directly

up to Anthony and shot him in the shoulder. Defendant then shot Michelle in

the head. Anthony suddenly got up, and defendant shot him again in the

shoulder. Defendant then fled.

     Anthony Cole testified that he and defendant had known each other for

about 15 years. According to Anthony, defendant and Michelle had been

engaged

but had broken off their engagement in the summer of 1990. Anthony had

dated

Michelle for about one month before Michelle was shot. Anthony testified

about a prior incident in which defendant threatened to kill Michelle and

Anthony if he ever saw them together. On January 2, 1991, Anthony,

defendant

and Michelle were riding in Anthony's car. Defendant suddenly jumped over

the

seat with a large butcher knife and attempted to stab Anthony. Anthony was

cut on his hand. Anthony and defendant jumped out of the car. While chasing

Anthony around the car, defendant said, "I told you if I saw you together I

would kill you." After both defendant and Anthony stopped running around the

car, defendant went to open the passenger door. Anthony then ran to the

police station for help. When he returned, Michelle came out of defendant's

house crying hysterically with a cut on her hand. Anthony took Michelle to

the hospital where she received stitches in her hand.

     The State also presented the testimony of Donald Smith, a firearms

examiner from the Illinois State Police. Smith examined the .38-caliber

revolver recovered from defendant's jacket and the bullet that had been

surgically removed from Cole. Smith concluded that the bullet could only have

been fired from the gun recovered. Smith also testified that, from the

single-action position, with the hammer cocked, the gun required 5½ pounds

of

pressure on the trigger in order to fire. In the double-action position, with

the hammer at rest, the gun required 13½ pounds of pressure on the trigger in

order to fire.

     As a final matter, the State presented the testimony of Assistant

Medical Examiner Nancy Jones, who performed an autopsy on the body of

Michelle. Jones testified that Michelle died as a result of a gunshot wound

to her head. The bullet went through Michelle's head. The entrance wound

measured about one-half inch in diameter and showed evidence of being a

near

contact range wound, meaning that the muzzle of the gun was very close to the

body at the time the weapon was fired. This was further evidenced by charring

or burning around the entrance wound. Jones determined that the muzzle of

the

gun was within an inch or less of Michelle's head when the gun was fired.

Jones further observed a "graze" gunshot wound on the back of Michelle's left

hand, indicating that Michelle's hand was in very close proximity to the

muzzle of the weapon at the time the weapon was fired. Michelle's right hand

also had gunpowder on the back of the thumb and wrist, indicating its close

proximity to the weapon when fired.

     After the State rested, defendant presented his case. Defendant's friend

Darrio Ramirez testified that in December of 1990 defendant and Michelle were

engaged to be married and he saw them together. Ramirez testified that he was

with defendant at a shopping mall on January 3, 1991, but that he did not see

Michelle and Anthony. Ramirez also testified that he saw Anthony at a

laundromat the day after Anthony was released from the hospital. He asked

Anthony what had happened the night of the shooting. Anthony told Ramirez

that he tried to grab defendant's gun and it went off, with the bullet

striking Michelle.

     Defendant testified on his own behalf. At the outset of his testimony,

defendant acknowledged that he was convicted of aggravated battery in 1986.

Defendant then went on to explain that he, Michelle, Anthony, Darrio, Noel

and Francisco were all "best of friends." He and Michelle became engaged in

July of 1988, but their engagement ended in September of 1990. After the

engagement was over, they continued to see one another. Defendant stated

that

around Christmas of 1990, he and Michelle exchanged gifts. He contended

that

he never really considered their relationship to be over.

     Defendant next described the incidents that occurred on January 2 and 3,

1991. On January 2, 1991, Anthony went to defendant's house with Michelle

in

the car. Anthony approached defendant and told him that defendant's

relationship with Michelle was over and Anthony was the "new guy in town."

Michelle got out of the car and stood next to Anthony, telling Anthony to let

it be. Anthony replied, "No. I'm going to show him what's up." Anthony then

removed a switchblade or pocket knife from his pocket and pointed it at

defendant. Defendant slapped the knife out of the way. When defendant

slapped

the knife away, it cut the palm of defendant's hand and then struck Michelle,

cutting her left hand. Defendant and Michelle went into the house and

defendant gave her a towel to wrap up her bleeding hand. The police came to

defendant's house but did not arrest defendant. Michelle subsequently left

with Anthony. Defendant denied ever pulling a butcher knife on Anthony and

Michelle.

     The next day, defendant went to the North Riverside shopping mall with

Darrio Ramirez and Darrio's girlfriend, Christina Rodriguez. Defendant

claimed that he did not see Michelle or Anthony at the mall that day. When

defendant arrived home, his brother told him that Anthony had been there

looking for him and that Anthony had a gun. Defendant then went to look for

Anthony. Defendant took his gun with him "just in case" Anthony had a gun.

Defendant, however, was unable to find Anthony. Defendant subsequently

went

to Michelle's house to pick up some of his belongings. While passing a police

station, he removed his gun from the passenger seat of his car and he put it

in the pocket of his jacket. When defendant arrived at Michelle's house, he

saw her and Anthony leaving her house. Defendant approached Michelle and

Michelle called him aside to talk to him. As he and Michelle were talking,

Anthony approached them. Anthony put his hand inside his jacket and said,

"What's up?" Defendant put his hand in his pocket. Defendant did not threaten

Anthony or Michelle. Defendant, however, was concerned that Anthony was

going

to pull out a gun, so defendant pulled out his gun and pointed it at Anthony.

Although defendant cocked the gun, he claimed that he did not have his finger

on the trigger. Defendant told Anthony, "Just let it be. Let it be." Suddenly

Anthony swung his arm toward defendant and hit the gun. The gun discharged

and a bullet struck Michelle. Michelle fell to the ground and defendant said

to Anthony, "Look what you did." Anthony replied, "I'm out of here. "

Defendant responded, "Tony, don't run," and fired at Anthony. Anthony kept

running, and defendant fired at him again.

     Defendant then left and drove to his sister Kimberly Alexander's house.

At some point, defendant took the bullets out of the gun. He threw three

empty bullet casings into the street and left the other three in his jacket

pocket. He parked the car at his sister's house, took off his jacket, and put

the gun in the right hand pocket of the jacket. He laid the jacket on the

front seat and got out of the car. Defendant then went up to the attic and

cried. Around 3 a.m., the attic door flew open and several police officers

entered the attic with their guns drawn. They told defendant to "freeze." The

officers handcuffed his hands behind his back and led him down the stairs to

the backyard. While in the backyard, Detective Cione asked defendant whether

he had any needles, knives or guns on him. Defendant said "No." Detective

Cione then searched him. According to defendant, he never told Detective

Cione where the jacket and gun were located.

     Defendant stated that he was then taken to the Berwyn police station,

where he was fingerprinted and photographed. Defendant stated that neither

Detective Cione nor Assistant State's Attorney White read him his Miranda

rights. Detective Cione asked defendant about the shooting several times, and

defendant refused to talk about it. Defendant denied making any statement to

Detective Cione or to Assistant State's Attorney White.

     Defendant concluded his testimony by stating that on the day of the

shooting, he still loved Michelle. He claimed that it was not his intent to

confront Michelle and Anthony or to shoot anyone. Defendant testified that

when Michelle was shot it was a "complete accident." After Michelle was shot,

defendant shot twice at Anthony because he did not want him to run away.

     After the defense rested, the State presented three rebuttal witnesses.

First, Detective Cione discussed defendant's conversation with him at the

Berwyn police station. After advising defendant of his Miranda rights,

Detective Cione conducted an interview with defendant which occurred at 4

a.m. and lasted approximately one hour. Defendant told Detective Cione that

he was standing behind a tree on January 3, 1991, as he saw Michelle and

Anthony walk out of Michelle's house. He approached them and fired one shot

at Anthony. Defendant stated that he then pointed the gun at Michelle's head

and fired one shot. Defendant also fired a second shot at Anthony. Next,

Assistant State's Attorney White testified that defendant never indicated to

her that Anthony had hit defendant's hand, causing the gun to discharge

accidentally and strike Michelle. Finally, Noel Garcia testified that he did

not see Anthony strike defendant's hand, causing the gun to discharge against

Michelle's head. Following the testimony of these rebuttal witnesses, the

State read defendant's 1986 aggravated battery conviction into the record.

     At the close of the evidence and arguments, the jury returned verdicts

finding defendant guilty of the first degree murder of Michelle, and of the

attempted murder and aggravated battery with a firearm of Anthony. Having

waived a sentencing jury before trial, defendant was sentenced by the trial

judge. The trial judge found defendant eligible for the death penalty based

upon the statutory aggravating factor that the murder had been committed in

a cold, calculated, and premeditated manner pursuant to a preconceived plan

to take human life by unlawful means, and that defendant's conduct created a

reasonable expectation that the death of a human being would result

therefrom. Ill. Rev. Stat. 1991, ch. 38, par. 9--1(b)(11).

     At the aggravation-mitigation phase of the death penalty hearing, the

State presented the following evidence in aggravation. Noel Garcia recounted

an incident in August of 1990. Following Garcia's date with Michelle, Garcia

was driving around with defendant, Anthony and Darrio Ramirez. After

dropping

off Anthony, they drove to a dead-end street and drank beer for awhile.

Defendant suddenly began to beat Garcia. Defendant tied him up, kicked him

and punched him in the face. Defendant then broke a bottle and held it to

Garcia's neck and said he was going to kill him because he had been with

Michelle. Just as defendant was about to poke the broken bottle into Garcia's

neck, Darrio stopped him. This incident left Garcia with a fractured nose.

     The State next called Chicago police detective James Cornelison.

Detective Cornelison testified that on August 22, 1985, defendant was

arrested for the beating of Hermilio Allencastro. The victim was in a coma

for approximately two weeks as a result of the beating. Defendant signed a

written statement regarding this incident. In defendant's statement, he

admitted punching the victim approximately 20 times in the chest and head,

and stomping on the victim's head about seven times. Defendant pled guilty to

aggravated battery as a result of this incident and was sentenced to five

years' imprisonment.

     Dawn Juarez, Michelle's best friend, next testified in aggravation.

Juarez testified that on October 4, 1990, she received a phone call from

Michelle. Michelle indicated that she was having problems with defendant.

When Juarez saw Michelle that day she had a black eye. Michelle explained

that defendant had taken her to a forest preserve, pulled her out of the car

and punched her. Defendant then put a gun to Michelle's head. Defendant told

her the gun had one bullet in it. Defendant pulled the trigger, but the gun

did not fire. Defendant then told Michelle that she was lucky that she did

not have to die that day, but if he could not have her then no one else would

have her. Juarez stated that she had previously seen bruises or marks on

Michelle's body. Michelle told her that these bruises and marks had been

caused by defendant when she had tried to break up with him.

     Finally, the State presented the testimony of Michelle's mother, Cheryl

Brueckmann. Brueckmann testified about a conversation she and Michelle had

in

September of 1990. Michelle told her that she was afraid of defendant because

he had threatened to kill her. Brueckmann had previously noticed bruises and

marks including a black eye on Michelle. During their conversation, Michelle

also told her mother that all of the bruises she had seen previously had been

caused by defendant.

     The State concluded by offering into evidence a certified statement of

defendant's 1986 conviction of aggravated battery, a written statement signed

by defendant in that case, and photographs of the victim of that incident.

     Defendant called a number of witnesses in mitigation. Defendant first

called Dr. George Savarese, a licensed clinical social worker. Dr. Savarese

testified about his psychosocial evaluation of defendant. A psychosocial

evaluation is an attempt to understand the developmental history of an

individual. Dr. Savarese testified that defendant's early childhood

represents a very dysfunctional emotional development because there was poor

attachment and bonding to his mother. Other social factors noted by Dr.

Savarese included the lack of a father figure in defendant's life,

defendant's bi-racial family, and the racial abuse he faced in his

neighborhood which was primarily Caucasian. Dr. Savarese believed that the

racial antagonism defendant faced while growing up resulted in low self-

esteem and a need for belonging. Defendant also possessed a deep fear of

rejection and abandonment, which became exaggerated in his relationship with

Michelle. Dr. Savarese testified that defendant perceived the loss of

Michelle to Anthony as rejection and betrayal of best friends. Dr. Savarese

concluded that the murder of Michelle and attempted murder of Anthony

resulted from an explosion of underlying rage.

     Defendant's neighbor, Christine Hernandez, testified that she had known

defendant since he was an infant. He was friendly and helpful and would often

do odd jobs for her. Hernandez testified that she never had any problems with

how defendant treated her or her family.

     Yolanda Nerie, who had known defendant for eight or nine years, also

testified in mitigation. Nerie stated that, during the year she had dated

defendant, he was never violent toward her. Defendant never had any hard

feelings about their relationship ending, and they remained friends after

they had stopped dating.

     Next, members of defendant's family testified in mitigation. Defendant's

two sisters, Gwendolyn Webber and Kimberly Alexander, testified that

defendant was not treated well by people in his neighborhood because he was

African-American. They further pointed out that defendant had a very good

relationship with their children and with Michelle. Webber specifically

stated that defendant never acted violently against Michelle. Defendant's

mother, Janie Webber, confirmed that defendant and Michelle seemed to love

each other. Moreover, they continued to see each other during the holidays in

1990. Defendant's mother also stated that, although defendant was a very

loving son, she was not a very loving mother.

     Finally, defendant elected to speak in allocution. Defendant apologized

to Michelle's family for the "terrible accident," apologized to his own

family, and concluded, "I am sorry. I wish it never happened." He also

expressed his continued love for Michelle.

     After considering evidence from both sides, the trial court found that

there were no mitigating factors sufficient to preclude imposition of a death

sentence. Accordingly, the trial court sentenced defendant to death for the

murder of Michelle. The trial court also sentenced defendant to concurrent

30-year sentences for the attempted murder and aggravated battery with a

firearm convictions. Defendant now appeals his convictions and death

sentence.

                               I. JURY SELECTION

                                       A.

                              Challenge for Cause

     Defendant first argues that the trial judge committed reversible error

by refusing to excuse for cause venire member Mark Posternack. Defendant

claims that venireman Posternack should have been removed for cause

because

of his lack of impartiality. Defendant contends that Posternack's voir dire

responses indicate that he had a bias against guns. Because this case

involved the use of a firearm, defendant urges, Posternack could not be

impartial. Defendant also contends that Posternack should have been removed

for cause because he expressed self-doubt concerning his ability to be

impartial.

     The voir dire of Posternack was conducted by the trial judge.

Defendant's argument is based on the following exchange between the trial

judge and Posternack:

               "Q. Can you still be fair and impartial if picked to serve as

          a juror?

               A. No.

               Q. What do you mean, no?

               A. I'm totally against guns. I hear about this all the time

          and I couldn't be fair if somebody had one.

               Q. You're totally against guns. So what?

               A. I don't think one should carry guns unless a police

          officer.

               Q. You haven't heard any facts yet. How can you assume that

          somebody was carrying a gun?

               A. I just don't think anyone should carry a gun unless they're

          a police officer.

               Q. If you were picked to serve on this jury would you be fair

          and impartial?

               A. I'd do my best.

               Q. What do you mean, your best?

               A. I would hear it out.

                                     * * *

               Q. Do you know of any reason why you cannot be fair and

          impartial if picked to serve in this case?

               A. As I stated before.

               Q. What is that?

               A. Gun control, otherwise, yes.

               Q. I don't know what you mean, gun control?

               A. Like I said, I'm against guns, any crime with guns.

               Q. In other words, if somebody--if they say somebody used a

          gun it's automatically a guilty, is that right?

               A. Well, not automatically guilty but I would say I would have

          a reasonable doubt why he was carrying a gun. Before, I would say

          he was guilty, I'd like to hear it out."

     The determination of whether to excuse a potential juror for cause rests

within the sound discretion of the trial judge. People v. Seuffer, 144 Ill.

2d 482, 502 (1991); People v. Hyche, 77 Ill. 2d 229, 239 (1979). In reviewing

the trial judge's determination, the entire voir dire examination of the

potential juror should be considered, as opposed to selected responses.

People v. Peeples, 155 Ill. 2d 422, 462-63 (1993). Because the trial judge is

in the best position to observe the potential juror's demeanor and ascertain

the meaning of his or her remarks, the trial judge's determination will not

be disturbed on review unless it is against the manifest weight of the

evidence. Peeples, 155 Ill. 2d at 463, 466; People v. Pasch, 152 Ill. 2d 133,

168-69 (1992).

     A venireperson should be removed for cause if his or her state of mind

is such that one of the parties will not receive a fair and impartial trial

with that venireperson as a juror. See Peeples, 155 Ill. 2d at 463; People v.

Cole, 54 Ill. 2d 401, 413 (1973). Simply giving an equivocal response,

however, will not require that a venireperson be excused for cause. See

People v. Hobley, 159 Ill. 2d 272, 297 (1994); Pasch, 152 Ill. 2d at 169

(potential jurors did have some difficulty with insanity defense; however,

they indicated they could consider the evidence as presented at trial and

then make a determination on defendant's sanity); People v. Johnson, 149 Ill.

2d 118, 138 (1992) (absolute certainty is not required in a potential juror's

responses). Rather, whether a venireperson can be impartial should be

determined from the venireperson's entire voir dire examination.

     In this case, when the entire voir dire examination of Posternack is

reviewed, it is apparent that Posternack would base his decision on the law

and the evidence regardless of his personal feelings. This is evidenced by

the following statements by Posternack in response to the trial judge's

questions:

               "Q. Will you follow the law as propounded to you by the Court

          regardless of your own personal feelings?

               A. Yes.

                                     * * *

               Q. So before you made up your mind you would wait until you

          heard the whole situation, both sides?

               A. Yes.

               Q. Right, sir?

               A. Yes.

               Q. Now, if the People prove the defendant guilty beyond a

          reasonable doubt will you return a verdict of guilty?

               A. Yes.

               Q. If the People fail to prove the defendant guilty beyond a

          reasonable doubt will you return a verdict of not guilty?

               A. Yes.

               Q. You understand that you are to consider the testimony of a

          police officer in the same light as that of an ordinary citizen and

          give it no greater weight just because it comes from a police

          officer?

               A. Yes.

               Q. You also understand that the defendant is presumed to be

          innocent and does not have to offer any evidence and this

          presumption remains with him throughout the trial and is not

          overcome unless after your consideration of all the evidence you

          find that the State has proved the defendant guilty beyond a

          reasonable doubt?

               A. Yes.

               Q. You also understand that the defendant does not have to

          testify and if he fails to testify you can draw no inference from

          that?

               A. Yes."

     It is clear that Posternack's complete voir dire examination revealed

him to be a person who possessed the essential qualifications to be a fair

and impartial juror. See People v. Zehr, 103 Ill. 2d 472, 477 (1984). We

therefore find that the trial judge's denial of defendant's motion to excuse

Posternack for cause was not against the manifest weight of the evidence. We

note that defendant also contends that he was prejudiced because, as a result

of the trial judge's refusal to remove Posternack for cause, he was forced to

exercise a peremptory challenge against Posternack and was thereby later

forced to accept an objectionable juror (Kenneth Vallon) after he had

exhausted all of his peremptory challenges. In light of our holding that the

trial judge properly refused to remove Posternack for cause, however,

defendant's argument in this respect fails.

                                       B.

                                  Batson Claim

     Defendant next argues that the trial judge erred in determining that

defendant had failed to establish a prima facie case of purposeful

discrimination in the prosecutor's use of a peremptory challenge under Batson

v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

     The record demonstrates that 52 venirepersons were questioned during

voir dire. The trial judge allowed each side 20 peremptory challenges during

jury selection. The defense exercised all 20 of its challenges, the trial

judge excused 14 potential jurors for cause, and the prosecution exercised

two peremptory challenges against David Price and Harold Martin. The record

suggests that Price was Caucasian and Martin was African-American. After the

prosecution exercised a peremptory challenge to excuse Martin, the trial

judge questioned John Sterba, a Caucasian venireman. The trial judge then

asked if defense counsel and the State would accept the panel. At this time,

defense counsel raised a Batson objection to the State's challenge of Martin

and requested that the State offer a race-neutral explanation for excusing

Martin.

     In response, the prosecutor pointed out that defense counsel was asking

the court to find a prima facie case of racial discrimination. The prosecutor

noted that several other African-American venirepersons had been questioned

and that Martin was the only African-American venireperson against whom the

prosecution had exercised a peremptory challenge. The prosecutor then stated

to the court:

          "You saw he was a black man with red hair. You heard the answers to

          his questions, that he was not satisfied. I don't think we have to

          at this time come forward with any reasons why this was--this man

          was excluded. *** It is obvious why this person was excluded."

     Defense counsel responded by attempting to compare Martin to Sterba,

who

was also not satisfied with the outcome of a criminal case. The State

informed the trial judge that, at that point in the proceeding, the trial

judge only had to determine whether a prima facie case had been established

and did not need to compare Martin with Sterba. The trial judge agreed that

defense counsel should only focus on Martin. After hearing further arguments,

the trial judge ruled that defendant had not established a prima facie case

of racial discrimination. It is this finding by the trial judge that

defendant now challenges.

     In Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712

(1986), the United States Supreme Court established a three-step process for

evaluating a claim that the State has exercised its peremptory challenges in

a racially discriminatory manner. First, the defendant must establish a prima

facie case of purposeful discrimination in the selection of the jury. Once

the defendant establishes a prima facie case, the burden shifts to the State

to articulate a race-neutral reason for challenging each of the venirepersons

in question. Finally, the trial judge must consider those explanations and

determine whether the defendant has met his burden of establishing

purposeful

discrimination. Batson, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct.

at 1723-24.

     A prima facie showing of discrimination under Batson requires the

defendant to demonstrate that relevant circumstances in the case raise an

inference that the prosecutor exercised peremptory challenges to remove

venirepersons based upon their race. Batson, 476 U.S. at 96, 90 L. Ed. 2d at

87-88, 106 S. Ct. at 1723; People v. Wiley, 156 Ill. 2d 464, 473 (1993). In

determining whether a prima facie case of discriminatory jury selection has

been established, the following relevant circumstances should be considered:

(1) racial identity between the defendant and the excluded venirepersons; (2)

a pattern of strikes against African-American venirepersons; (3) a

disproportionate use of peremptory challenges against African-American

venirepersons; (4) the level of African-American representation in the venire

as compared to the jury: (5) the prosecutor's questions and statements during

voir dire examination and while exercising peremptory challenges; (6) whether

the excluded African-American venirepersons were a heterogeneous group

sharing race as their only common characteristic; and (7) the race of the

defendant, victim, and witnesses. People v. Hudson, 157 Ill. 2d 401, 426

(1993); Wiley, 156 Ill. 2d at 473-74; People v. Andrews, 146 Ill. 2d 413,

425-26 (1992). A trial judge's determination of whether a prima facie case

has been shown will not be overturned unless it is against the manifest

weight of the evidence. Hudson, 157 Ill. 2d at 426; Peeples, 155 Ill. 2d at

469.

     Our review of the evidence in light of all the relevant circumstances

reveals that a prima facie case of discrimination under Batson was not

established. The trial court's ruling was not against the manifest weight of

the evidence.

     The first relevant circumstance is whether defendant and the excluded

venireperson share the same race. Here, defendant and Martin are both

African-Americans. Although this circumstance is relevant, it is not

dispositive in determining whether a prima facie case exists. See Peeples,

155 Ill. 2d at 470.

     We next consider whether the evidence in this case establishes a pattern

of strikes against African-American venirepersons by the prosecution. It has

previously been held that a pattern of strikes is created "where the strikes

affect members of a certain race to such a degree or with such a lack of

apparent nonracial motivation that it suggests the possibility of racial

motivation." Andrews, 146 Ill. 2d at 429. The record shows that the

prosecution exercised one of two peremptory challenges against African-

American venirepersons. We acknowledge that the exclusion of even one

venireperson because of race is unconstitutional and violates Batson

regardless of the number of African-Americans not excluded. Peeples, 155 Ill.

2d at 468; Andrews, 146 Ill. 2d at 434. Nevertheless, we find that the

State's exercise of one peremptory challenge to exclude an African-American

venireperson is not strongly suggestive of racial motivation and does not

constitute a pattern of strikes against African-American venirepersons. See

Peeples, 155 Ill. 2d at 470 (State's use of one out of eight peremptory

challenges to exclude an African-American venireperson does not constitute a

pattern of strikes against African-Americans). We further note that before

exercising this challenge, the prosecutor challenged one Caucasian and

accepted one African-American venireperson. Consequently, there appears no

discernable racial pattern to the State's exercise of its peremptory

challenges.

     The next factor to be considered is whether there is a disproportionate

use of peremptory challenges by the prosecution against African-American

venirepersons. Comparing the number of African-American and non-African-

American venirepersons stricken by the State reveals whether the State used

a disproportionate number of peremptory challenges to exclude African-

Americans. Andrews, 146 Ill. 2d at 430. Here, the prosecutor challenged only

one African-American venireperson and one Caucasian venireperson. This does

not demonstrate a disproportionate use of peremptory challenges against

African-Americans.

     Next, we consider the level of African-American representation in the

venire as compared to the jury. The record indicates that there was one

African-American juror. On a jury of 12 persons where one is African-

American, the level of African-American representation is 8.3%. Nevertheless,

we cannot compare the level of African-American representation on the jury

with that of the venire because the record does not indicate the number of

African-Americans in the venire. See Peeples, 155 Ill. 2d at 472. The absence

of evidence as to the level of African-American representation in the venire

renders this factor neutral in the determination of a prima facie case. See

Andrews, 146 Ill. 2d at 435.

     The next relevant circumstance concerns the prosecutor's questions and

statements during voir dire examination and while exercising peremptory

challenges. In this case, the trial judge alone conducted voir dire and no

statements were made by the prosecution when it exercised its peremptory

challenge against Martin. However, in response to defendant's Batson

objection, the prosecution stated that Martin "was a black man with red

hair." Defendant insists that this statement evidences discriminatory intent.

We disagree. This statement was merely descriptive and reminded the trial

judge that defendant's Batson objection regarded Martin and not Sterba,

whose

voir dire examination immediately preceded defendant's Batson objection.

     Another relevant circumstance in determining if a prima facie case of

discrimination has been established is whether the excluded African-American

venirepersons were a heterogeneous group sharing race as their only common

characteristic. Here, the only excluded African-American venireperson was

Martin. Because Martin was the only African-American venireperson excluded

by

the State, there is no excluded "group" within which to compare any nonracial

characteristics. Pasch, 152 Ill. 2d at 164. Defendant however claims that

also relevant to this factor is whether the excluded African-American

venirepersons share any characteristic with the non-African-American jurors.

See Andrews, 146 Ill. 2d at 431-32. Although we have considered the nonracial

characteristics common to stricken African-American venirepersons and non-

African-American jurors in assessing heterogeneity, we find that this

consideration is not mandatory in every case. See People v. Henderson, 142

Ill. 2d 258, 290 (1990) (it is not the role of the court to search for

possible similarities between stricken black and accepted white

venirepersons). Here, when defense counsel attempted to compare Martin with

Sterba, the Caucasian juror who also was not satisfied with the outcome of a

criminal case, the trial judge instructed defense counsel to focus on Martin.

Based on the foregoing, we find that this comparison was not required at this

stage of the proceedings.

     The final factor relevant to establishing a prima facie case of

purposeful discrimination is the race of the defendant, the victim and the

witnesses. We have held that the racial characteristics of a crime are

important factors. Andrews, 146 Ill. 2d at 433. Although the record does not

disclose the race of the witnesses, it does reveal that defendant is African-

American and the victim was Caucasian. This factor may suggest an inference

of purposeful discrimination. See Andrews, 146 Ill. 2d at 433.

     After considering all the relevant factors in this case, we find that a

prima facie case of discrimination under Batson was not established. The only

factors suggesting purposeful discrimination include the racial identity

between defendant and the excluded venireperson and the interracial nature of

the crime. All other factors tend to refute an inference of discrimination or

weigh neutrally in the balance. Therefore, we conclude that the trial judge's

determination that defendant failed to establish a prima facie case was not

against the manifest weight of the evidence.

     In closing, we note that the dissent asserts that the State offered

explanations in response to the defendant's Batson claim so as to render the

issue of whether the defendant had established a prima facie case of racial

discrimination moot. This interpretation is belied by the record. As

discussed above, the State's comments were merely descriptive. Moreover, the

State informed the trial court that it was premature to give any explanation

for excluding Martin. The trial judge ruled only on the prima facie issue,

which is the first step of Batson. Given that the State did not offer any

explanation for its peremptory challenge of Martin and that the trial judge

did not proceed past the prima facie determination, we find that the prima

facie issue is not moot.

                                II. TRIAL ISSUES

                                       A.

                             Exclusion of Evidence

     Defendant claims that the trial judge erred in denying his motion to

suppress his statement to the police, given at his sister's house, regarding

the location of the gun because he had not yet received Miranda warnings at

that time. Defendant contends that the gun and the evidence obtained from

the

gun should also have been suppressed because it was recovered as a result of

the statement.

     At the hearing on defendant's motion to suppress, Detective Cione

testified that on the morning of January 4, 1991, defendant was discovered in

the attic of his sister's building. Defendant's sister, her husband and their

four children lived on the first floor, while the building's landlord and his

family lived on the second floor. After defendant was located in the attic,

defendant was placed under arrest pursuant to a warrant. Defendant was then

handcuffed and taken from the attic to the backyard, where Detective Cione

conducted a patdown search for weapons. Detective Cione asked defendant

whether he had any weapons, knives or needles on him. Detective Cione did

not

give defendant Miranda warnings prior to asking this question. Defendant

responded that he did not have a weapon on him, but that a gun was in his

coat in the attic. No other questions were asked of defendant at this time.

     At the conclusion of the suppression hearing, the trial judge ruled that

defendant's statement and the gun were admissible pursuant to the public

safety exception enunciated in New York v. Quarles, 467 U.S. 649, 81 L. Ed.

2d 550, 104 S. Ct. 2626 (1984). In Quarles, police officers chased a

suspected rapist who was armed with a gun into a supermarket. The officers

apprehended the defendant and handcuffed him. During a patdown search,

the

officer discovered that the defendant was wearing an empty shoulder holster.

The officer asked the defendant about the location of the gun. The defendant

nodded toward some empty cartons and stated, "The gun is over there." When

the defendant made this statement, he had not yet been given Miranda

warnings.

     The United States Supreme Court nevertheless held that defendant's

statement and the gun were admissible. The Court reached this holding by

creating a public safety exception to the requirement of Miranda warnings

prior to custodial interrogation. The Court established this limited

exception because the presence of a gun in a public place posed a danger to

public safety. The Court noted that an accomplice might make use of the gun

or a customer or employee might later come upon it. Quarles, 467 U.S. at 657,

81 L. Ed. 2d at 558, 104 S. Ct. at 2632. The Court reasoned that requiring

the police to give the defendant Miranda warnings before asking the

whereabouts of the gun might have deterred the defendant from responding

and

put the public at risk. Quarles, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S.

Ct. at 2632. Therefore, the Court concluded that "the need for answers to

questions in a situation posing a threat to the public safety outweighs the

need for the prophylactic rule protecting the Fifth Amendment's privilege

against self-incrimination." Quarles, 467 U.S. at 657, 81 L. Ed. 2d at 558,

104 S. Ct. at 2632.

     The public safety exception of Quarles applies to this case. Here,

defendant was entitled to Miranda warnings because he was in custody and

the

police officer interrogated him. As noted in Quarles, police faced with an

immediate threat to public safety may ask questions necessary to secure the

safety of the public or themselves prior to issuing Miranda warnings.

Quarles, 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626. The record reveals

that the loaded gun was in the attic of a house occupied by two families.

There were also police officers on the scene. These facts demonstrate that

the concealed gun posed a threat to the safety of those individuals living in

the building and the police officers on the scene. Under these circumstances,

it is reasonable to find that Detective Cione was attempting to secure the

safety of himself, his fellow officers, and innocent persons in the area from

immediate danger when he asked defendant whether he was carrying any

weapons.

Detective Cione did not ask defendant any other questions at that time. This

indicates that Detective Cione's question was not designed to elicit

testimonial evidence from defendant. Based upon the foregoing, we find that

the public safety exception to Miranda warnings applies to defendant's

statement. The trial judge did not err in denying defendant's motion to

suppress this statement and the gun.

                                       B.

                      Improper Questioning by Trial Judge

     Defendant charges that the trial judge acted improperly in asking him

certain questions about the incident on January 2, 1991. Defendant assigns

error to the following colloquy at the end of defense counsel's re-direct

examination:

               "THE COURT: For my own clarification, Mr. Williams, did you

          have the gun in your pocket or in your hand when he swung at you

          with the knife?

               DEFENSE COUNSEL: Objection, Your Honor. There is no testimony

          about him having a knife when he had the gun.

               THE COURT: I'm talking about Cole with the knife.

               DEFENSE COUNSEL: That was the day before. That was a different

          incident.

               THE COURT: That's what I'm talking about. I just want to know.

               DEFENSE COUNSEL: I object to the Court asking any questions

          that's confusing to me.

               THE COURT: Sir, you stated that you had a gun in your pocket?

               DEFENDANT: Yes, sir.

               THE COURT: You also stated that Anthony Cole had a knife in

          his hand?

               DEFENDANT: That wasn't on the same day, sir.

               THE COURT: You didn't have the gun in your pocket on that

          date?

               DEFENDANT: No, sir."

     Defendant argues that the foregoing questions denied him a fair trial

because they impugned his credibility. Defendant points out that there was no

evidence that a gun had been involved in the January 2, 1991, incident. By

asking defendant where he carried the gun, defendant contends, the trial

judge implied that defendant's testimony was not truthful. In addition,

defendant claims that the trial judge's questions also implied that the judge

believed defendant to be a very dangerous individual who was habitually

armed

with a handgun. Defendant insists that he was prejudiced by these questions

and that he is therefore entitled to a new trial.

     It is well established that a trial judge has the right to question

witnesses in order to elicit the truth or to clarify issues which seem

obscure. People v. Nevitt, 135 Ill. 2d 423, 456 (1990); People v. Hooper, 133

Ill. 2d 469, 495 (1989); People v. Hopkins, 29 Ill. 2d 260, 265-66 (1963);

People v. Palmer, 27 Ill. 2d 311, 314 (1963). The trial judge's examination

must be conducted in a fair and impartial manner, without indicating bias or

prejudice against either party. People v. Marino, 414 Ill. 445, 450 (1953);

People v. Santucci, 24 Ill. 2d 93, 98 (1962). Whether the trial judge's

questioning is proper depends on the circumstances of each case and rests

largely within the discretion of the trial court. Nevitt, 135 Ill. 2d at 456;

Palmer, 27 Ill. 2d at 315.

     The trial judge's questions in the present case did not violate these

principles. It is apparent from the record that the trial judge was

attempting to clarify what he considered to be confusing testimony. On direct

examination, defendant testified that on January 2, 1991, Anthony pulled a

knife out of his pocket and pointed it at defendant. Defendant then slapped

the knife away, and it struck Michelle. Defendant also stated that as he

slapped the knife away, he was cut on the palm of his right hand. Defendant

subsequently testified about the shooting incident at Michelle's house on

January 3, 1991. Defendant stated that he had the gun in his pocket when he

arrived at Michelle's house. According to defendant, Anthony put his hand in

his jacket and defendant put his hand in his pocket. Defendant became

paranoid that Anthony would pull out a gun so defendant pointed his gun at

Anthony. Anthony then hit the gun and it went off and struck Michelle. On

redirect examination, defendant demonstrated how Anthony swung at him

when

defendant had the gun. Defense counsel then asked, "And when he swung in

that

manner ... is that when he struck your hand?" and defendant replied, "Yes,

sir." The trial judge apparently perceived the foregoing testimony to be

confusing in light of defendant's earlier testimony that he had been struck

on the hand the previous day when Anthony pulled a knife. The trial judge

asked questions to clarify whether defendant had a gun in his hand on

January

2, 1991. The judge's questions about the gun did not indicate a bias,

prejudice or hostility against defendant. Neither did the judge imply that he

found defendant to be not credible. Rather, the judge merely sought to

clarify defendant's version of the incident. Under these circumstances, we

conclude that the trial judge did not abuse his discretion by questioning

defendant about the gun.

                                       C.

                              Improper Impeachment

     Defendant asserts that he is entitled to a new trial because the trial

court committed reversible error in denying his motion to bar the State from

impeaching his credibility with evidence of his 1986 conviction for

aggravated battery. Defendant contends that his aggravated battery conviction

had no bearing on his testimonial credibility. Instead, defendant protests,

such evidence was highly prejudicial because it suggested to the jury that

defendant had a propensity for violent criminal behavior.

      The rule governing the admission of prior convictions to impeach a

witness' credibility has been examined by this court on a number of

occasions. In People v. Montgomery, 47 Ill. 2d 510 (1971), this court

provided trial courts with discretion to allow impeachment of a witness'

testimonial credibility by admitting a prior conviction. Montgomery, 47 Ill.

2d at 515. More specifically, the Montgomery rule provided that, for the

purpose of attacking a witness' credibility, evidence of a prior conviction

is admissible only if (1) the crime was punishable by death or imprisonment

in excess of one year; or (2) the crime involved dishonesty or false

statement regardless of the punishment. In either case, however, the evidence

is inadmissible if the judge determines that the probative value of the

evidence of the crime is substantially outweighed by the danger of unfair

prejudice. Montgomery, 47 Ill. 2d at 516. In addition, evidence of a

conviction under this rule is inadmissible if a period of more than 10 years

has elapsed since the date of conviction or release of the witness from

confinement, whichever is later. Montgomery, 47 Ill. 2d at 516.

     This court recently reexamined the Montgomery rule in People v.

Williams, 161 Ill. 2d 1 (1994). In Williams, this court determined that the

lower courts were mechanically applying the Montgomery rule to allow

impeachment of a testifying defendant with virtually all types of prior

felony convictions. Williams, 161 Ill. 2d at 38-39. This court was concerned

with the lack of emphasis

 lower courts had placed on the third prong of the Montgomery rule, that is,

the balancing test. We emphasized the importance of conducting the balancing

test of probative value versus unfair prejudice before admitting prior

convictions for impeachment purposes. Williams, 161 Ill. 2d at 38-41. 

     Following this court's decision in Williams, there has been confusion in

the appellate court regarding whether Williams modified or changed the rule

established in Montgomery. See People v. Bramlett, 276 Ill. App. 3d 201

(1995); People v. Elliot, 274 Ill. App. 3d 901 (1995); People v. Fomond, 273

Ill. App. 3d 1053 (1995); People v. Maxwell, 272 Ill. App. 3d 57 (1995). We

hold that Williams does not alter the three-prong rule set forth in

Montgomery. Rather, this court in Williams was expressing concern about the

indiscriminate admission of all prior felony convictions for impeachment

purposes absent application of the critical balancing test mandated by

Montgomery.

     The defendant in Williams was on trial for murder, and the trial judge

allowed the State to impeach the defendant with a prior conviction for

voluntary manslaughter. In overruling the defendant's objection to the

impeachment, the trial judge stated that the conviction was " `of great

probative value in a case of this nature,' " and, further, was " `highly

probative of the nature of the offense.' " Williams, 161 Ill. 2d at 40. The

trial judge seemingly allowed the impeachment because the underlying offense

demonstrated the defendant's propensity for violence. As this court

explained:

          "The court's references to `a case of this nature' and `the nature

          of the offense' indicate that the trial judge admitted the evidence

          of the prior homicide conviction as being probative of the issue of

          defendant's guilt of the charged offense of murder, rather than as

          bearing upon defendant's credibility as a witness." Williams, 161

          Ill. 2d at 40.

     To be sure, there is language in Williams to the effect that this court

no longer approved of the common rationale that a witness' prior felony

conviction may by itself evince disrespect for social order and therefore

supply a proper basis for impeachment. Williams, 161 Ill. 2d at 39. It has

been noted that this discussion in Williams could be construed as eliminating

the first part of the Montgomery test, leaving as eligible grounds for

impeachment only convictions for offenses that involve dishonesty or false

statement and that thus qualify under the second part of Montgomery. See

Bramlett, 276 Ill. App. 3d at 211-13 (Steigmann, J., specially concurring);

Fomond, 273 Ill. App. 3d at 1068; Maxwell, 272 Ill. App. 3d at 61; see also

M. Graham, Cleary & Graham's Handbook of Illinois Evidence §609.4, at 82-87

(Supp. 1996). We now wish to make clear our continued adherence to the

three-

part test set forth in Montgomery.

     Turning to the facts of the present case, we find no error in the

proceedings below. Contrary to the defendant's argument, there is no reason

to suppose that the trial judge failed to weigh the probative value of the

impeachment against its possible prejudicial effect. A review of the

transcript shows that the judge was fully aware of the Montgomery standard

and the balancing test it requires. The parties referred to the balancing

test in their arguments to the judge on the question whether the defendant

could be impeached with the earlier conviction. In similar circumstances,

this court has declined to find error when the transcript makes clear that

the trial judge was applying the Montgomery standard, even though the judge

did not expressly articulate it (see People v. Redd, 135 Ill. 2d 252, 325-26

(1990)), and the same result must be reached here. Although the trial judge

in this case did not explicitly state that he was balancing the opposing

interests, there is no reason to suppose that he disregarded the familiar,

well-established Montgomery standard in determining that the impeachment

was

proper.

                                       D.

                    Trial Judge's Response to Jury Questions

     During its deliberations, the jury sent two notes to the trial judge.

Defendant now argues that the trial judge erred in the manner in which he

responded to the jury's notes.

     The first note requested the following: (1) the distance from which a

gun could leave a burn mark on skin; (2) Assistant State's Attorney White's

report; (3) a copy of defendant's 1986 arrest report; and (4) copies of the

"other exhibits that were entered." In response to this note, the following

exchange occurred between the trial judge and defense counsel:

               "THE COURT: I am going to answer.

               DEFENSE COUNSEL 1: Those are a series of questions.

               THE COURT: You going to tell me how to answer?

               DEFENSE COUNSEL 1: I'd like to read it.

               THE COURT: Here, read it.

               DEFENSE COUNSEL 1: Don't you think counsel has a right to read

          the questions?

               THE COURT: Sure. You read them, but don't tell me what to do.

               DEFENSE COUNSEL 1: The first question from Corn--

               THE COURT: That is the name of one of the jurors.

               DEFENSE COUNSEL 1: No, it is the medical examiner's how far

          for the gun to leave a burn mark? 2 Can we have the report that

          Kathy White wrote? 3 A copy of [defendant's] 1986 arrest report.

          Now in relationship to that one, I don't think they are talking

          about the certified copy.

               THE COURT: I don't want to know what you think.

               DEFENSE COUNSEL 1: Number 4, can we have copies of the other

          exhibits that were entered?

               THE COURT: Did you read it?

               DEFENSE COUNSEL 1: Yes. Now I will give my answers.

               THE COURT: Please continue to deliberate. You have all of the

          exhibits and I am just going to say please continue to deliberate.

          And I am going to mark this 7-14-93 and I am going to initial.

          Anything you want to put on there?

               DEFENSE COUNSEL 2: Yes, Judge today is the 13th.

               THE COURT: Anything you want to put on the record?

               DEFENSE COUNSEL 2: No."

     Defendant challenges the trial judge's actions in responding to this

note. Defendant contends that the trial judge conducted a "de facto ex parte"

proceeding because the trial judge refused to allow defense counsel to

participate in formulating a response to the jury's note. Because of the

trial judge's improper actions, defendant insists, he was denied his sixth

amendment right to counsel. The State responds that this argument is waived.

The State points out that defense counsel neither made an objection at the

time of the alleged error nor stated this reason as grounds for error in his

post-trial motion. It is well established that both an objection at trial and

a written post-trial motion raising the issue are necessary to preserve an

alleged error for review. People v. Enoch, 122 Ill. 2d 176, 186 (1988).

Application of the waiver rule, however, is less rigid where the basis for

the objection is the trial judge's conduct. Nevitt, 135 Ill. 2d at 455. We

will address defendant's claim of alleged judicial impropriety.

     Defendant relies on this court's decision in People v. Childs, 159 Ill.

2d 217 (1994), as support for his contention that the jury's requests were

considered in a "de facto ex parte" proceeding. In Childs, the jury sent a

note to the trial judge with a question regarding the instructions. The trial

judge informed the prosecutors of the question and his response. However, the

trial judge made no effort to contact defense counsel before answering the

jury's note. This court in Childs noted that "a defendant has an absolute

right to be informed of any jury question involving a question of law and to

be given the opportunity to participate for his protection in fashioning an

appropriate response." Childs, 159 Ill. 2d at 234. The Childs court held that

the defendant was denied that right because defense counsel was not

consulted

prior to the trial court's response to the jury's question and, therefore,

defense counsel was not able to participate in the process of determining

what would be an appropriate response. Childs, 159 Ill. 2d at 234.

     The facts in this case are distinguishable from those in Childs. When

the trial judge received the jury's note, he read the note on the record with

both defense counsel and the State present. Defense counsel was able to make

statements on the record. In fact, the trial judge gave defense counsel an

open invitation to raise objections, stating, "Anything you want to put on

the record?" Defense counsel responded, "No." Under these circumstances, we

find that the trial judge did not conduct a "de facto ex parte" proceeding,

and defendant was not deprived of his constitutional right to counsel.

     In addition to the first note, the jury sent the trial judge a second

note, which requested the following documents: (1) a transcript of

defendant's testimony; (2) a transcript of Detective Cione's testimony; (3)

Detective Cione's written report; (4) Assistant State's Attorney White's

report; and (5) defendant's initialed report of his rights being read to him.

The trial judge responded by informing the jury that it had been given all of

the exhibits admitted into evidence, had heard sworn testimony of the

witnesses, and to continue deliberations. Defendant charges that the trial

judge erred in refusing to give the jury the items requested.

     The State responds that defendant waived any error that may have

occurred in the trial judge's response to the second note. It is the State's

contention that defense counsel acquiesced in all but "the form of the

court's answer" and failed to preserve this argument. We disagree. The record

reveals that after reading the jury's note, defense counsel asked the court

to "attempt to get the testimony for them." Defense counsel also stated that

he had no objection to giving the jury the requested Miranda form. It was

only when the subject of the discussion changed from the substance of the

jury's request to the wording of the response to the request that counsel

objected to the "form of the court's answer." It is evident from defense

counsel's responses that he sought to have the requested reports and

transcripts provided to the jury. This is not a new argument raised for the

first time on appeal. We, therefore, do not find defendant's argument waived.

     Defendant maintains that the trial judge should have complied with the

jury's request for Assistant State's Attorney White's report, Detective

Cione's report, and defendant's initialed report acknowledging Miranda

warnings. These items, however, were not admitted into evidence. Where

documents have not been admitted into evidence, the trial judge is without

discretion to provide them to the jury during deliberations. People v.

Johnson, 146 Ill. 2d 109, 151 (1991); see also People v. Bradley, 220 Ill.

App. 3d 890, 901-02 (1991). Because these documents were not admitted into

evidence, the trial judge properly refused to give them to the jury.

     Defendant further argues that the trial judge should have complied with

the jury's request for transcripts of the testimony of Detective Cione and

defendant. The determination of whether to grant or deny a jury's request to

review transcripts of witnesses' testimony rests within the sound discretion

of the trial court. People v. Pierce, 56 Ill. 2d 361, 364 (1974). Absent an

abuse of that discretion, the trial court's determination will not be

disturbed on review. Pierce, 56 Ill. 2d at 364; People v. Franklin, 135 Ill.

2d 78, 105 (1990); People v. Olinger, 112 Ill. 2d 324, 349 (1986). In the

present case, the record indicates that the trial judge invited arguments and

objections from both sides. The trial judge listened to the arguments put

forth, exercised his discretion, and determined that the best response was to

tell the jurors that they had heard the sworn testimony of the witnesses, and

that they should continue to deliberate. There is nothing in the record to

indicate that the trial judge abused his discretion in denying the jury's

request. We therefore find that the trial judge properly exercised his

discretion in refusing to provide the requested transcripts to the jury.

                             III. SENTENCING ISSUES

                                       A.

                            Validity of Jury Waiver

     Defendant charges that his death sentence must be vacated because his

waiver of a jury for his capital sentencing hearing was invalid. Defendant

asserts that his waiver of a jury for sentencing was not knowing and

intelligent because the trial court did not advise him that one juror could

prevent the imposition of a death sentence. This argument has already been

considered and rejected by this court. People v. Ramey, 152 Ill. 2d 41, 59

(1992) (for a jury waiver at a capital sentencing hearing to be knowing,

intelligent, and voluntary, a defendant need not be expressly advised that

the vote of a single juror will preclude imposition of the death penalty or

that the decision of the jury to impose the death penalty must be unanimous);

People v. Thompkins, 161 Ill. 2d 148, 178-79 (1994); People v. Ruiz, 132 Ill.

2d 1, 20-21 (1989).

     There is no "fixed formula" that a court must recite prior to accepting

a defendant's valid waiver of a jury at sentencing. People v. Strickland, 154

Ill. 2d 489, 517 (1992). Instead, we have held that it is sufficient for a

valid jury waiver that the trial court explain to the defendant that he is

waiving the right to have a jury consider the capital sentencing issues and

that the sentencing decision would, therefore, be made by the judge alone.

People v. Wiley, 165 Ill. 2d 259, 301 (1995); Ramey, 152 Ill. 2d at 59. Here,

the trial judge explained to defendant that he was waiving his right to have

the jury consider the capital sentencing issues and that the sentencing

decision would, therefore, be made by the trial judge alone. Given these

admonishments by the trial judge, we find the jury waiver to be valid. See

Ramey, 152 Ill. 2d at 59.

                                       B.

                                  Eligibility

     Defendant charges that his death sentence must be vacated because the

sole aggravating factor relied on by the trial court to find eligibility is

invalid. The trial court found defendant eligible for the death sentence

pursuant to the aggravating factor set forth in section 9--1(b)(11) of the

Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9--1(b)(11)).

Section 9--1(b)(11) provides that a statutory aggravating factor sufficient

to make a defendant eligible for the death penalty exists if:

               "the murder was committed in a cold, calculated and

          premeditated manner pursuant to a preconceived plan, scheme or

          design to take a human life by unlawful means, and the conduct of

          the defendant created a reasonable expectation that the death of a

          human being would result therefrom." Ill. Rev. Stat. 1991, ch. 38,

          par. 9--1(b)(11).

Defendant asserts that section 9--1(b)(11) is unconstitutionally vague under

the eighth and fourteenth amendments to the United States Constitution (U.S.

Const., amends. VIII, XIV). More specifically, defendant suggests that the

terms "cold, calculated and premeditated" are open to many interpretations.

Defendant therefore contends that section 9--1(b)(11) must be given a

limiting construction to render it constitutional. Because the trial court

here failed to apply a narrowing construction to section 9--1(b)(11),

defendant claims, his death sentence is invalid.

     This court has already rejected the argument that the term "cold,

calculated and premeditated," as used in 9--1(b)(11), is unconstitutionally

vague. People v. Johnson, 154 Ill. 2d 356, 372-73 (1993). In that case, we

found that the challenged terms provide adequate guidance for assessing death

eligibility. Johnson, 154 Ill. 2d at 373. When considering the totality of

the words used in section 9--1(b)(11), we find that they provide sufficient

guidelines for the sentencer in determining eligibility. See People v.

Munson, 171 Ill. 2d 158, 191 (1996). We therefore reaffirm our holding in

Johnson that section 9--1(b)(11) is constitutionally valid.

     In a related argument, defendant challenges the sufficiency of the

evidence to establish his eligibility for the death penalty under section 9--

1(b)(11). Defendant contends that the evidence failed to show that he

committed the murder in a "cold, calculated and premeditated manner" as

described in section 9--1(b)(11). It is defendant's contention that the

murder occurred because of rage, which developed spontaneously at the scene.

We disagree.

     The evidence indicates that on the day before the murder, defendant

attacked Michelle and Anthony with a butcher knife, and threatened to kill

them if he ever saw them together. The following afternoon defendant became

upset when he saw Michelle with Anthony at the shopping mall. Later that

same

day, defendant took a loaded .38-caliber revolver and drove to Michelle's

house. When defendant arrived at Michelle's house, he parked the car around

the corner and hid behind a tree and waited for Michelle to come out of the

house. When Michelle and Anthony came out of the house, defendant emerged

from behind the tree, carrying the loaded gun, and walked directly up to

Anthony and shot him in the left shoulder. As Anthony fell to the ground,

defendant placed the gun within an inch from Michelle's head and shot her.

Then, defendant shot Anthony in the right shoulder as Anthony attempted to

run away.

     These facts demonstrate that defendant's actions were not spontaneous.

The sentencer could find that defendant murdered Michelle after much

thought

and reflection. Defendant had ample time for reflection the previous day

after he threatened Michelle and Anthony and attacked them with a knife.

Defendant had more time for reflection after he again saw Michelle and

Anthony together at the mall the next afternoon. Defendant's actions in

driving home and then proceeding to Michelle's house later that evening with

a loaded gun show that defendant contemplated this murder well in advance.

We

find that this evidence supports the trial court's determination that

defendant murdered Michelle in a cold, calculated and premeditated manner

pursuant to a preconceived plan, scheme or design to take her life by

unlawful means. Furthermore, defendant's conduct in shooting Michelle in the

head at close range created a reasonable expectation that she would die.

Thus, the evidence was sufficient to prove the existence of the aggravating

factor set forth in section 9--1(b)(11).

                                       C.

                             Denial of Continuance

     Defendant asserts that the trial court abused its discretion when it

denied defendant a continuance for the second stage of the sentencing

hearing. Defendant insists that a continuance was warranted because he

provided the trial court with specific information establishing that much of

his investigation into mitigation was incomplete.

     Following the trial court's finding of eligibility, defense counsel

filed a motion requesting a continuance to allow Dr. George Savarese,

defendant's mitigation specialist, additional time to complete his

psychosocial evaluation of defendant. A psychosocial evaluation is an attempt

to understand the developmental history of an individual. The trial court

granted defendant a continuance from August 9, 1993, to September 27, 1993,

approximately seven weeks. The trial court indicated to defense counsel that

no further continuances would be allowed. On September 27, 1993, defense

counsel filed an affidavit from Dr. Savarese stating that he was unable to

complete his investigation. According to Dr. Savarese, there were remaining

family members and friends to interview and additional documents to view.

Defense counsel, however, did not request a second continuance. The

sentencing hearing then proceeded.

     Defendant argues that the trial court abused its discretion when it did

not grant a continuance following defense counsel's filing of Dr. Savarese's

affidavit. This court has held that the granting or denial of a continuance

is a matter resting in the sound discretion of the trial judge, and a

reviewing court will not interfere with that decision unless there has been

a clear abuse of discretion. People v. Gosier, 145 Ill. 2d 127, 156-57

(1991); People v. Collins, 106 Ill. 2d 237, 281 (1985). Here, the record

reveals that Dr. Savarese evaluated defendant's childhood, family history,

health history, educational history, employment history, criminal and prison

records. Despite a claim that the investigation was incomplete, Dr. Savarese

was able to present his expert opinion regarding the cause of defendant's

actions. Dr. Savarese found that the murder of Michelle and attempted murder

of Anthony resulted from an explosion of underlying rage, following

defendant's perceived rejection and betrayal of his best friends. In

addition, the defense presented further evidence in mitigation through the

testimony of defendant's neighbor, defendant's former girlfriend, two of

defendant's sisters, and defendant's mother. They provided testimony as to

defendant's good character and difficult childhood. In light of the

foregoing, it is evident that defense counsel provided substantial evidence

in mitigation. Any further evidence would likely have been cumulative.

Therefore, we find that the trial court did not abuse its discretion in

denying any further continuances.

     In a related argument, defendant argues that defense counsel was

ineffective for failing to renew the request for a continuance after filing

Dr. Savarese's affidavit. Given that we have found no abuse of discretion in

the trial court's failure to grant a second continuance, defendant's argument

fails.

                                       D.

                               Rebuttal Argument

     Defendant contends that he was denied a fair sentencing hearing because

the trial court permitted the State to argue in rebuttal at the aggravation-

mitigation phase of the capital sentencing hearing. The trial judge has

discretion to allow the State to present a rebuttal argument since the State

is the moving party at the sentencing hearing. People v. Williams, 97 Ill. 2d

252, 302-03 (1983). This court's holding in Williams has been repeatedly

reaffirmed. People v. Tenner, 157 Ill. 2d 341, 382 (1993); People v. Page,

155 Ill. 2d 232, 282-83 (1993); People v. Caballero, 102 Ill. 2d 23, 47-48

(1984). Defendant has not presented any compelling reason for this court to

reconsider its prior decisions. We, therefore, reject defendant's argument.

                  IV. CONSTITUTIONALITY OF THE ILLINOIS DEATH

                                PENALTY STATUTE

     In his final two arguments, defendant challenges the constitutionality

of the Illinois death penalty statute. We decline defendant's invitation to

revisit the following arguments: (1) that the death penalty statute places a

burden of proof on the defendant that precludes meaningful consideration of

mitigation (People v. Johnson, 154 Ill. 2d 356, 373 (1993); People v.

Mitchell, 152 Ill. 2d 274, 345-46 (1992); People v. Bean, 137 Ill. 2d 65,

138-40 (1990)); and (2) that the death penalty statute does not sufficiently

minimize the risk of arbitrarily or capriciously imposed death sentences

(Tenner, 157 Ill. 2d at 390; People v. Whitehead, 116 Ill. 2d 425, 465

(1987); People v. Albanese, 104 Ill. 2d 504, 541-42 (1984)). This court has

previously considered and rejected these arguments. Defendant offers no

persuasive reason for this court to reconsider its prior decisions.

     Accordingly, we find no merit to defendant's challenges to the

constitutionality of the Illinois death penalty statute.

                                   CONCLUSION

     For the reasons set forth above, we affirm defendant's convictions and

sentences. We direct the clerk of this court to enter an order setting

Wednesday, September 18, 1996, as the date on which the sentence of death,

entered by the circuit court of Cook County, shall be carried out. Defendant

shall be executed in the manner provided by law. Ill. Rev. Stat. 1991, ch.

38, par. 119--5. The clerk of this court shall send a certified copy of this

mandate to the Director of Corrections, to the warden of the Stateville

Correctional Center, and to the warden of the institution where defendant is

now confined.

Affirmed.

                                                                              

     JUSTICE HARRISON took no part in the consideration or decision of this

case.

     JUSTICE FREEMAN, dissenting:

     Under our sentencing scheme, the second phase of a death penalty hearing

requires the jury or the court to weigh and balance any mitigating factors

against the aggravating factors. People v. Turner, 156 Ill. 2d 354, 359

(1993). If there are no mitigating factors sufficient to preclude imposition

of the death penalty, the court shall sentence the defendant to death. Ill.

Rev. Stat. 1991, ch. 38, par. 9--1.

     In this case, the trial court found no mitigation sufficient to preclude

death. A majority of this court now affirms that sentence. I disagree. In

People v. Carlson, 79 Ill. 2d 564 (1980), and People v. Buggs, 112 Ill. 2d

284 (1986), this court, finding that the trial court had not appropriately

balanced the mitigation evidence, was prompted to reduce those defendants'

death sentences to life imprisonment. The facts here, though different from

those in Carlson and Buggs, give rise to the same kind of concerns. Thus, in

my view, the same result which occurred in Carlson and in Buggs should

obtain

here.

     In this case, the record reveals that the conduct which ultimately led

to Michelle Brueckmann's death was triggered by defendant's loss of an

exclusive romantic relationship with her. The record consistently

demonstrates that the motivation behind this young defendant's violent

conduct, from the time of his breakup with Michelle until her untimely death,

was defendant's emotional inability to cope with the loss of that

relationship. Significantly, the events, which occurred over the course of a

four- to five-month period after the breakup, involved those people with whom

defendant had previously enjoyed a close and lasting friendship.

     A review of the evidence is illustrative. Defendant testified that he

met Michelle in 1984. He was best friends with her, Anthony Cole, Darrio

Ramirez and Noel Garcia.

     In 1984 defendant and Michelle became engaged to be married. The

engagement terminated around September 1990, however, according to

defendant,

the two continued to see each other. Defendant stated that he did not really

consider their relationship as boyfriend and girlfriend to be terminated. In

fact, on Christmas of 1990, defendant purchased Christmas gifts for Michelle.

     Michelle's mother, Cheryl Brueckmann, testified that Michelle's

engagement to defendant lasted for approximately one year. Prior to becoming

engaged, Michelle and defendant had been "going together" for a couple of

years. Although the engagement was terminated in the summer of 1990, the

couple continued seeing each other.

     Noel Garcia testified that he had known defendant for about ten years;

he used to "hang out" with him. During that time, Garcia saw defendant

almost

every day. Garcia was also best friends with Anthony Cole and he knew

Michelle. According to him, as of January 3, 1991, Michelle and defendant

were continuing to date.

     At sentencing, Garcia testified that in August of 1990, he dated

Michelle for a couple of days. On one of their dates, Garcia and Michelle

attended the Pan American Fest with Anthony Cole and Dawn Juarez. On the

following day, Garcia and defendant went for a drive with Anthony and Darrio

Ramirez. After dropping off Anthony, Garcia, Ramirez and defendant continued

driving until they reached a dead-end street by the Chicago River. They

parked and began to drink a little.

     While the three were together, and as Darrio stood watching, defendant

tied up Garcia and began kicking him in the face and punching him.

Defendant

then broke a bottle, put it to Garcia's neck and told Garcia that he was

going to kill him because he had been with Michelle. Darrio intervened and

Garcia subsequently passed out.

     As a result of the beating, Garcia sustained a fractured nose and a

scarring injury under his left eye. Garcia did not identify defendant to

police investigators as his attacker. Instead, he told the police that he had

been jumped by some "gang bangers."

     Anthony Cole also testified that he and defendant had been friends for

about 15 years, seeing each other almost every day. At the time of Michelle's

death, Cole had known Michelle, as a friend, for about five years. Cole

testified that he and Michelle dated for about one month before she was

killed.

     Cole further testified that on January 2, 1991, defendant approached him

at his home and asked if he had been seeing Michelle. Cole denied seeing her;

however, he was dating her and, in fact, Michelle had spent the night at

Cole's house.

     Cole subsequently called to Michelle to come out of the house and to

join him and defendant. Michelle joined them and the three subsequently

entered Cole's car with defendant riding alone in the back seat. Cole then

proceeded to drive defendant home. Prior to arriving at defendant's house,

defendant jumped into the front seat with a butcher knife. A struggle ensued

and, as a result, Cole received a cut on his hand. Cole stopped the car, he

and defendant jumped out, and defendant chased Cole around the car.

According

to Cole, defendant threatened then that if he saw Cole and Michelle together

again, he would kill Cole.

     Michelle sustained a cut on hand as a result of this incident. Cole left

the area and summoned the police. The police responded and recovered the

knife. Cole took Michelle to the hospital for treatment; he, however,

received no medical attention for his injury. There were no arrests as a

result of this incident.

     The next day, upon seeing Cole and Michelle together again, defendant

shot and wounded Cole and fatally wounded Michelle.

     There is also testimony that defendant had previously physically

assaulted Michelle. On one occasion in particular, defendant beat Michelle,

then held a gun to her head and pulled the trigger. He threatened that if he

could not have her that no one else would. Fortunately, the gun had no bullet

in the chamber which was fired.

     As is apparent from these accounts, the recurring theme in each episode

which led up to Michelle's death is defendant's jealous anger over what

defendant perceived to be a "love triangle" involving him, his girlfriend and

his best friends. The seriousness of these episodes is evident. However, and

while I do not mean to diminish that seriousness, the particular people

involved as well as the time frame in which these incidents occurred cannot

be ignored. Given the dynamics in this case, I find death an inappropriate

sentence.

     Incidentally, Dr. George Savarese, a licensed clinical social worker,

testified that Michelle's murder resulted from an explosion of defendant's

underlying rage, following defendant's perceived rejection and betrayal of

his best friends.

     My colleagues would rightfully assert that a sentencing judge's

sentencing determination is to be afforded much deference and that altering

a defendant's sentence must be approached cautiously and with the utmost

circumspection. These are established and highly valued principles to which

I most assuredly adhere. However, they are just that, principles. And,

although they guide us in our review, when warranted, they cannot preclude a

decision to alter what is an inappropriate sentencing determination.

     Defendant testified that he always believed that he and Michelle were

"going together." The testimony of Michelle's mother and of Garcia lend

credence to his testimony. This then is clearly a case in which the defendant

was unable to appropriately manage the loss of his exclusive relationship

with Michelle. Defendant's problem with managing this loss was merely

exacerbated by the fact that the parties who became romantically involved

with Michelle were defendant's closest friends.

     Notably, this defendant had no juvenile criminal history, until the age

of 17, at which time he was convicted of aggravated battery. Except for those

events, which appear to have been motivated by defendant's anticipated loss

of his exclusive romantic relationship with Michelle, the record does not

evidence an ongoing pattern of depraved or violent conduct.

     The circumstances surrounding these unfortunate incidents were

uncontrolled passion and jealous anger. Without question, this defendant

should be punished for his terrible deeds. However, unless we carefully sift

together all of the facts, all of the circumstances, and all of the dynamics

which combine to bring about the commission of a particular offense, we risk,

as in this case, a nondiscriminating application of what should be a most

discriminately applied punishment--death.

     As a final matter, I note my agreement with Justice Nickel's dissent on

the issue of the alleged Batson violation. I cannot concur in the majority's

characterization of the State's proffered explanation as "merely

descriptive." There were only two venirepersons requiring distinction for the

court. One was a Caucasian male and the other an African-American male. As

between the two, the only necessary and identifying distinction was race.

"Merely descriptive" then, would have been "the black man." The State's

unnecessary characterization of the African-American venireperson--"You saw

he was a black man with red hair"--though not dispositive, certainly suggests

the occurrence of a Batson violation. So colorful a characterization not only

invites, but warrants, a closer look. I therefore also join Justice Nickel's

dissent.

     JUSTICE NICKELS, also dissenting:

     Normally the first step of the Batson inquiry into a claim that the

prosecution has exercised peremptory challenges in a racially discriminatory

manner is to determine whether the defendant has established a prima facie

case of racial discrimination. Purkett v. Elem, 514 U.S. ___, ___, 131 L. Ed.

2d 834, 839, 115 S. Ct. 1769, 1770-71 (1995). However, when the prosecution

volunteers its race-neutral explanation for excusing a challenged

venireperson before the trial court's determination that the defendant has

established a prima facie case of discrimination, the question of whether the

defendant has satisfied step one of the Batson inquiry is rendered moot.

People v. Hope, 168 Ill. 2d 1, 19 (1995), citing Hernandez v. New York, 500

U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866 (1991).

     In the instant case, defense counsel raised a Batson objection to the

prosecution's exercise of a peremptory challenge against venireperson Martin.

In response, the prosecution first asserted that it was not required to give

reasons for the challenge until a prima facie case had been established.

Nevertheless, prior to the trial court's determination regarding the prima

facie case, the prosecution volunteered to the court that: (1) Martin was an

African-American with red hair (2) who was not satisfied with the outcome of

several cases and (3) that it was obvious from the situation why Martin was

excluded.

     This court has held that "[o]nce the prosecutor offers a race-neutral

basis for his exercise of peremptory challenges, it is the trial court's duty

to determine if the defendant has established purposeful discrimination."

People v. Kitchen, 159 Ill. 2d 1, 19 (1994), citing Batson v. Kentucky, 476

U.S. 79, 98, 90 L. Ed. 2d 69, 88-89, 106 S. Ct. 1712, 1723-24 (1986); see

also Purkett, 514 U.S. at ___, 131 L. Ed. 2d at 839, 115 S. Ct. at 1770-71

(if a race-neutral explanation is tendered by the prosecution, the trial

court must decide whether the opponent of the strike has proved purposeful

discrimination). Therefore, because the prosecution here offered race-neutral

reasons for its peremptory challenge of Martin, the question of whether a

prima facie case had been established was rendered moot and the trial court

was required to rule upon the ultimate issue of discrimination. Instead, the

trial court found only that a prima facie case had not been established.

     Even though the issue had been rendered moot, the majority,

nevertheless, upholds the trial court's finding that a prima facie case had

not been established. However, the proper analysis of cases in which the

prima facie question is rendered moot is to review the trial court's findings

regarding the legitimacy of the prosecution's race-neutral reasons. See Hope,

168 Ill. 2d at 19-21; Kitchen, 159 Ill. 2d at 19; People v. Mitchell, 152

Ill. 2d 274, 289 (1992). In the instant case, the trial court made no

findings as to the reasons offered by the prosecution.

     The legitimacy of the prosecution's race-neutral reasons is generally a

factual matter determined by the trial court because the trial judge is in

the best position to observe the demeanor of potential jurors and then

evaluate prosecutive explanations for peremptory challenges. Mitchell, 152

Ill. 2d at 296; see also Hernandez, 500 U.S. at 365, 114 L. Ed. 2d at 409,

111 S. Ct. at 1869, quoting Wainwright v. Witt, 469 U.S. 412, 428, 83 L. Ed.

2d 841, 854, 105 S. Ct. 844, 854 (1985). In addition, after the prosecution

offers reasons for its peremptory challenges, the defense counsel is then

allowed an opportunity to rebut the prosecution's reasons as being

pretextual. Mitchell, 152 Ill. 2d at 288. However, in the instant case the

trial court affirmatively prevented defense counsel's attempts to develop

rebuttal evidence.

     Because the establishment of the prima facie case was rendered moot, the

trial court should have allowed defendant an attempt to rebut the

prosecution's explanations as pretextual and completed the Batson analysis.

For the foregoing reasons, I would remand the cause to the trial court for

further proceedings pursuant to Batson. Therefore, I respectfully dissent.

     JUSTICE FREEMAN joins in this dissent.